UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| WILLIAM USCHOLD, et al., | Case No. 18-cv-01039-JSC |
| Plaintiffs, | |
| v. | **ORDER RE: AMENDED MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT** |
| NSMG SHARED SERVICES, LLC, | Re: Dkt. No. 48 |
| Defendant. | |

William Uschold and Tyrone Dangerfield filed this state law wage-and-hour action on behalf of themselves and others similarly situated against their employer, NSMG Shared Services, LLC ("NSMG" or "Defendant").[1] (Dkt. No. 1 at 11.)[2] Plaintiffs allege that NSMG violated California state law in its operation of a commission payment system and failed to reimburse Plaintiffs for reasonable business expenses incurred while using personal property for work purposes. Now before the Court is Plaintiffs' amended, unopposed motion for preliminary approval of the parties' class action settlement agreement.[3] (Dkt. No. 48.) After reviewing the proposed settlement, with the benefit of oral argument on October 2, 2019, and upon review of the amended proposed Class Notice filed October 3, 2019, (Dkt. No. 52), the Court GRANTS the motion for preliminary approval.

//

---

[1] Plaintiffs acknowledge that the complaint erroneously named Defendant as Northstar Memorial Group; Northstar Memorial Group d/b/a Chapel of the Chimes; Chapel of the Chimes; and NSMG Shared Services, LLC d/b/a Northstar Memorial Group Shared Services. (Dkt. No. 48 at 8.) The Court recaptioned the case accordingly.

[2] Record citations are to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of the documents.

[3] All parties have consented to the jurisdiction of a magistrate judge pursuant to 28 U.S.C. § 636(c). (Dkt. Nos. 9 & 16.)

# BACKGROUND

Plaintiffs filed this action in the Superior Court of California for the County of Alameda on January 17, 2018, asserting five claims for relief: (1) unlawful collection of wages earned in violation of California Labor Code § 221; (2) unauthorized deductions in violation of California Labor Code § 224; (3) failure to reimburse for all necessary and reasonable business expenses in violation of California Labor Code § 2802; (4) failure to pay wages in violation of California Labor Code § 510 et seq.; and (5) violation of California Business & Professions Code § 17200. (Dkt. No. 1, Ex. A.) Defendant answered the complaint on February 15, 2018 and removed the case to this District on February 16, 2018. (Dkt. No. 1 at 1.)

The parties participated in private mediation on October 24, 2018 and February 5, 2019 but were unable to reach a settlement agreement. (Dkt. No. 48-2 at ¶¶ 3, 11.) The parties continued to negotiate, however, and on March 8, 2019, Plaintiffs filed a Notice of Settlement. (Dkt. No. 36.) The terms of the settlement agreement are memorialized in the parties' Joint Stipulation of Class Settlement and Release (the "Settlement Agreement"). (*See* Dkt. No. 48-2, Ex. A.)

## I.     The Parties

NSMG is a limited liability corporation organized under Delaware law; the company maintains its principal place of business in Houston Texas. (Dkt. No. 4 at ¶¶ 3-4.) "NSMG employs individuals who provide funeral and burial related services throughout the Bay Area." (Dkt. No. 24 at 2.) Plaintiffs are former Bay Area employees of NSMG who worked for the company in 2017. (Dkt. No. 1, Ex. A at ¶ 7.)

## II.    Complaint Allegations[4]

Defendant paid Plaintiffs using a "commission payment system," whereby the company advanced commission to Plaintiffs "[o]n a weekly basis." (*Id.* at ¶ 2.) Plaintiffs were required to

---

[4] The Settlement Agreement provides that "[f]ollowing execution of the Settlement Agreement, Class Counsel shall file the First Amended Complaint, . . . by stipulation of the parties." (Dkt. No. 48-2, Ex. A at ¶ 33.) The Settlement Agreement includes the First Amended Complaint as an exhibit. (*See* Dkt. No. 48-2, Ex. B; *see also* Dkt. No. 36 at 1-2 ("Plaintiffs intend to provide an Amended Complaint as part of the process for requesting the Court's preliminary and final approval of the class settlement.").) The original complaint remains the operative complaint before the Court, however, until Plaintiffs file the First Amended Complaint.

meet the sales quota set by Defendant each week "to actually earn the commission." (*Id.*) If Plaintiffs did not meet the quota, Defendant would "recoup or 'chargeback' the commission each week." (*Id.*) As explained by Plaintiffs:

> The chargebacks are cumulative so that an Employee may still owe a chargeback on a week he did earn the commission. Yet, if an Employee exceeds the quota, his excess commission or points are neither paid nor accumulated to offset future weeks. Defendant[ ] set the quota based on a 40-hour work week regardless of whether an Employee actually works 40 hours in a week.

(Dkt. No. 1, Ex. A at ¶ 2.) Plaintiffs did not know the terms of the commission payment system or how it operated "until several months into employment." (*Id.*) Defendant's operation of the commission payment system "violated numerous Labor Code provisions" because Defendant failed to obtain "express authorization from [e]mployees" regarding its use and the system resulted in "unlawful deductions of earned commissions." (*Id.*)

Defendant also knew or required that its employees "use[ ] personal property for work including personal vehicles for travel to meet with clients and prospective clients and personal cell phones for business calls." (*Id.*) Defendant did not, however, "reimburse all necessary and reasonable business expenses as required by California law." (*Id.*)

In addition to violating the California Labor Code, Defendant's acts "constitute unlawful and unfair business practices in violation of California Unfair Competition Laws" ("UCL"), California Business & Professions Code § 17200. (*Id.*) Plaintiffs "seek unpaid wages, reimbursement for necessary and reasonable business expenses, statutory penalties, injunctive relief, attorneys' fees and costs, prejudgment interest, and other relief the [C]ourt may deem appropriate." (*Id.* at ¶ 3.)

## III.    Settlement Agreement

### A.    Proposed Class

The proposed class consists of "all employees paid commissions by Defendant . . . at any time from January 17, 2014 through the date of Preliminary Approval of Settlement."[5]  (Dkt. No.

---

[5] Plaintiff's counsel Allyssa Villanueva's declaration in support of the instant motion attests that "the putative class size [is] at least 429 persons." (Dkt. No. 48-2 at ¶ 20.)

48-2, Ex. A at ¶ 10.) The parties "conditionally stipulate and agree that the requisites for establishing class certification . . . have been met, . . . for purposes of effectuating th[e] Settlement Agreement." (*Id.* at ¶ 34.)

### B. Proposed Operative Complaint for Settlement Purposes

Defendant consents to Plaintiffs filing a First Amended Complaint ("FAC") adding Tiana Naples and Jose Almendarez as named plaintiffs. (Dkt. No. 48-2, Ex. A at ¶ 33.) The FAC also adds new factual allegations and additional claims that will be settled and released through the Settlement Agreement. (*Id.* at ¶¶ 19, 33.) In total the proposed FAC alleges claims for: (1) Unlawful Collection of Wages Earned, Cal. Lab. Code § 221; (2) Unauthorized Deduction, Cal. Lab. Code § 224; (3) Failure to Reimburse for Necessary and Reasonable Business Expenditures, Cal. Lab. Code § 2802; (4) Failure to Pay Wages, Cal. Lab. Code §§ 510, 1174; (5) Breach of Contract; (6) Fraud – Intentional Misrepresentation; (7) Fraud – False Promise; (8) Failure to Pay Minimum Wages, Cal. Lab. Code §§ 1194, 1197; (9) Failure to Provide Meal Periods, Cal. Lab. Code §§ 226.7, 512, 1198; (10) Failure to Provide Rest Periods, Cal. Lab. Code §§ 226.7, 1198 and applicable Wage Orders; (11) Failure to Provide Accurate Wage Statements, Cal. Lab. Code §§ 226, 226.3; (12) Failure to Timely Pay Wages, Cal. Lab. Code § 204; (13) Failure to Timely Pay All Final Wages, Cal. Lab. Code § 201-203; (14) violation of the UCL, Cal. Business & Professions Code § 17200; and (15) violation of the Private Attorneys General Act ("PAGA"), Cal. Lab. Code § 2698 et seq. (*Id.* at ¶ 19; *see also* Dkt. No. 48-2, Ex. B at 54-55.)

### C. Payment Terms

Defendant agrees to pay $2.2 million ("Gross Settlement Amount") to the Settlement Administrator, who will deposit that amount in a qualified settlement fund. (Dkt. No. 48-2, Ex. A at ¶¶ 37-40.) The following will be deducted from the Gross Settlement Amount: (1) payment of $33,000 to the Labor Workforce Development Agency to settle the PAGA claim asserted in the FAC; (2) the Settlement Administrator's fees and costs, not exceeding $9,000.00; (3) Plaintiffs' attorneys' fees (not exceeding $736,200.00 (representing one-third of the Gross Settlement Amount)) and costs (not exceeding $20,000.00); (4) "Defendant's estimated share of applicable payroll taxes to be paid on the individual settlement payments"; and (5) "Service Awards" of

$2,000.00 to each of the four named Plaintiffs in the FAC.  (Dkt. No. 48-2, Ex. A at ¶¶ 41, 53, 54, 60, 68.)  The remainder following those deductions (approximately $1,417,400.00) constitutes the "Net Settlement Amount" from which individual class members will be paid ("Class Settlement Payments").  (*Id.* at ¶¶ 41-42.)

### 1.    Class Settlement Payments

The individual Class Settlement Payments for class members that do not opt out will be calculated as follows:

> (a) Each Class Member's "Total Individual Workweeks" will be determined on a pro-rata basis as determined by the number of workweeks each Class Member worked in the state of California from January 17, 2014 through the date of preliminary approval of the settlement.[6]

> (b) The Total Individual Workweeks for each Class Member will be aggregated to determine the "Total Class Gross Workweeks."

> (c) The estimated Individual Settlement Payment for each Class Member set forth in the Class Notice will be based on: (a) each Class Member's Total Individual Workweeks; (b) divided by the aggregate number of Total Class Gross Workweeks of all Class Members; (c) multiplied by the value of the Net Settlement Amount.

(*Id.* at ¶ 42(a)-(c).)  In other words, each class member will receive a pro-rata share of the Net Settlement Amount based on the number of weeks the individual worked compared to the number of weeks worked by all class members.  A class member has sixty days "to dispute the information on the Notice, including his or her Total Individual Compensation."  (*Id.* at ¶ 47.)

One-third of each Class Settlement Payment is allocated to wages, which are "subject to all applicable wage laws, including federal, state and local tax withholding and payroll taxes, and shall be reported on Form W-2."  (*Id.* at ¶ 49; *see also* Dkt. No. 52 at 5 ("IRS W2 Forms will be issued to Class Members for the payments allocated to payment of wages.").)  The Settlement Administrator will issue the wage payments and calculate and withhold "all required federal, state and local taxes."  (Dkt. No. 48-2, Ex. A at ¶ 49.)  The remaining portion of each Class Settlement

---

[6] According to the Settlement Agreement, "[e]ach Class Member's Total Individual Workweeks will be determined by reference to [Defendant's] records, subject to each Class Member's right to submit evidence in support of disputed claims."  (Dkt. No. 48-2, Ex. A at ¶ 42(c).)

Payment is divided evenly—one-third allocated to interest and one-third allocated to penalties "and other non-wage damages sought in the Action." (Dkt. No. 48-2, Ex. A at ¶ 49.) Those payments "will not have withholdings deducted"; instead, "IRS 1099 Forms will be issued" to class members. (Dkt. No. 52 at 5.) Class members are ultimately "responsible for the appropriate payment of any federal, state and/or local income or payroll taxes on the Class Settlement Payments they receive and agree to indemnify and hold harmless Defendant for any tax liability arising out of or relating to" a class member's "failure to pay taxes on any amounts paid pursuant to [the] Settlement Agreement." (Dkt. No. 48-2, Ex. A at ¶ 50.)

The Settlement Administrator will mail Class Settlement Payments by check to individual class members within ten days of the "Effective Date."[7] (*Id.* at ¶ 43.) The face of each check will state that it "must be cashed or deposited within" 180 days, and all payments will include a cover letter stating the same. (*Id.*) If a class member does not cash or deposit his or her check within 120 days of mailing, the Settlement Administrator will notify the class member by letter or postcard that the check will expire and become void if it is not "cashed or deposited within the remaining two months." (Dkt. No. 48-2, Ex. A at ¶ 44.) No later than 30 days after the 180-day period has passed, Plaintiffs' counsel "will report to the Court the total amount" paid to class members and any amount remaining in the qualified settlement fund. (*Id.* at ¶ 63.) The remaining amount will be distributed *cy pres* as follows: fifty percent to the charitable organization "Foundation for Advocacy Inclusion and Resources"; twenty-five percent to the California State Treasury "for deposit in the Trial Court Improvement and Modernization Fund"; and twenty-five percent "to the State Treasury for deposit into the Equal Access Fund of the Judicial Branch." (*Id.*) No settlement funds will revert to Defendant. (*Id.* at ¶ 37.)

The parties' motion for final approval should provide more information about these potential *cy pres* recipients and their relationship to the issues in this lawsuit, as well as any

---

[7] The Settlement Agreement defines "Effective Date" as the later of: "(i) March 31, 2019, (ii) sixty-five (65) calendar days after the entry of the Final Approval Order(s) if no appeal or motion to set aside and vacate judgment is filed, or (iii) ten (10) business days after the final resolution of appeal or motion to set aside and vacate judgment if any such motion or appeal is filed and unsuccessful." (Dkt. No. 48-2, Ex. A at ¶ 14.)

relationship to counsel.  *See* N.D. Cal. *Procedural Guidance for Class Action Settlements* ¶ 8.  The motion for final approval should also explain why any uncashed amounts should *not* be provided to the State of California as unclaimed property rather than distributed to the *cy pres* recipients or whether the parties have agreed that the amounts of uncashed checks can be provided to the State of California as unclaimed property.

### D.    Release

Class members, including named Plaintiffs, agree to release Defendant[8] from all claims, whether state or federal, arising at any point during the "Settlement Period" (defined as January 17, 2014 through the date of preliminary approval) that are asserted in the FAC or could have been asserted based on the same nucleus of operative facts.  (*See id.* at ¶¶ 13, 96-100.)  In addition, the named Plaintiffs agree to a release of all claims "that were or could have been asserted by Plaintiffs which arise out of or relate in any way to their employment with NSMG," and a general release of all claims ("to the fullest extent they may be released under applicable law") that arise "prior to the last day of the Settlement Period."  (*Id.* at ¶¶ 101-02.)  To effectuate the general release, "Plaintiffs expressly waive and relinquish all rights and benefits [under] California Civil Code section 1542."  (*Id.* at ¶ 103.)

### E.    Notice

Within 20 days of preliminary approval:

> Defendant shall provide the Settlement Administrator an electronic file(s) containing the following information for each Class Member: (1) full name; (2) last-known address; (3) social security number (if known); and (4) the gross individual workweeks from January 17, 2014 through the date of preliminary approval for work done as a commissioned sales employee in the state of California.

(Dkt. No. 48-2, Ex. A at ¶ 69.)  No later than 40 days after preliminary approval, the Settlement

---

[8] The "Released Parties" covered under the Settlement Agreement include: "Defendant and its affiliates, parent company, and subsidiaries, and each of their respective affiliates, parent companies, subsidiaries, related entities, officers, directors, members, partners, owners, shareholders, employees, former employees, agents, servants, attorneys, assigns, independent contractors, volunteers, predecessors, successors, and organizations, insurers, and any and all other persons, firms and corporations in which Defendant or its affiliates may have an interest."  (Dkt. No. 48-2, Ex. A at ¶ 12.)

Administrator must mail the notice of settlement ("Notice") to class members "by United States first class mail, postage prepaid." (*Id.* at ¶ 71.)

The Notice includes, in pertinent part: a description of the lawsuit including an overview of the allegations and claims; contact information for Plaintiffs' counsel and the Settlement Administrator; a summary of the settlement amount, its distribution, and the methodology for calculating the individual Class Settlement Payments; and the release of claims. (Dkt. No. 52 at 1-8.) The Notice also informs class members of their "Rights and Options"; specifically: (1) participate in the settlement by doing nothing and automatically receiving a Class Settlement Payment; or (2) opt-out by mailing a written and signed "Exclusion Request" to the Settlement Administrator within 60 days of the mailing of the Notice; or (3) object to the settlement by mailing a "Notice of Objection" to the Court within 60 days of the mailing of the Notice. (*Id.* at 7-8.) Plaintiffs are further notified that they may attend the final approval hearing (date to be determined by the Court) in person or through an attorney but are not required to do so. (*Id.* at 7.)

## DISCUSSION

A class action settlement must be fair, adequate, and reasonable. Fed. R. Civ. P. 23(e)(2). Where, as here, parties reach an agreement before class certification, "courts must peruse the proposed compromise to ratify both the propriety of the certification and the fairness of the settlement." *Staton v. Boeing Co.*, 327 F.3d 938, 952 (9th Cir. 2003). If the court preliminarily certifies the class and finds the settlement appropriate after "a preliminary fairness evaluation," then the class will be notified, and a final fairness hearing scheduled to determine if the settlement is fair, adequate, and reasonable pursuant to Rule 23. *Villegas v. J.P. Morgan Chase & Co.*, No. CV 09-00261 SBA (EMC), 2012 WL 5878390, at *5 (N.D. Cal. Nov. 21, 2012).

## I. Conditional Certification of the Settlement Class

Class actions must meet the following requirements for certification:

> (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed R. Civ. P. 23(a). In addition to meeting the requirements of Rule 23(a), a putative class action must also meet one of the conditions outlined in Rule 23(b)—as relevant here, the condition that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Prior to certifying the class, the Court must determine that Plaintiffs have satisfied their burden of demonstrating that the proposed class satisfies each element of Rule 23.

### A. Rule 23(a)

The Rule 23(a) factors are satisfied. First, "the putative class size [is] at least 429 persons." (*See* Dkt. Nos. 1 at 5 & 48-2 at ¶ 20.).) The Court is thus satisfied that the class satisfies the numerosity requirement.

Second, the commonality requirement is satisfied because there are common questions of law and fact arising out of the allegedly unlawful commission payment system Defendant used to compensate all putative class members and Defendant's alleged failure to reimburse its employees for reasonable and necessary business expenditures. *See Bellinghausen v. Tractor Supply Co.*, 303 F.R.D. 611, 617 (N.D. Cal. 2013) (finding commonality requirement satisfied where class members were subject to the same challenged policies and procedures). Third, the typicality requirement is similarly satisfied because Plaintiffs' claims challenge a course of conduct that applied to all class members, and thus, all class members suffered the same or similar injury. *See Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) ("The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct."); *see also Bellinghausen*, 303 F.R.D. at 617 (finding the typicality requirement satisfied because the named plaintiff "allege[d] that he, like the other class members, worked for [d]efendant in California during the class period and was subject to the same wage-and-hour policies and procedures at issue in [the] litigation").

Finally, the named Plaintiffs and class counsel appear to be adequate representatives of the class. The named Plaintiffs were employed by Defendant during the class period and allegedly

injured by the same course of conduct common to all class members; thus, Plaintiffs' interest in this litigation is aligned with that of the class. *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 594-95 (1997) ("Representatives must be part of the class and possess the same interest and suffer the same injury as the class they seek to represent."). Plaintiffs' counsel has experience litigating labor and employment actions, and although they "have not previously been appointed class counsel for plaintiff class action matters," counsel is currently serving as "lead trial counsel" in "three other employment law class actions (two in federal court and one in state court)." (Dkt. No. 48-1 at ¶¶ 10-13, 14; *see also* Dkt. No. 48-2 at ¶ 23); *see Bellinghausen*, 303 F.R.D. at 617 (noting that "class counsel must be qualified, experienced, and generally able to conduct the class action litigation") (internal quotation marks and citation omitted).

**B.      Rule 23(b)(3)**

As previously discussed, Rule 23(b)(3) requires establishing the predominance of common questions of law or fact and the superiority of a class action relative to other available methods for the fair and efficient adjudication of the controversy. Rule 23(b)(3) includes the following nonexhaustive list of factors pertinent to the predominance and superiority analysis:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b).

The Court concludes that there are no predominance or superiority concerns because the challenged policies are common to all class members.

**1.      Predominance**

Rule 23(b)(3) first requires "predominance of common questions over individual ones" such that "the adjudication of common issues will help achieve judicial economy." *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996). This "inquiry focuses on the relationship between the common and individual issues." *Vinole v. Countrywide Home Loans, Inc.*, 571 F.3d 935, 944 (9th Cir. 2009) (internal quotation marks and citation omitted). In

particular, the predominance requirement "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods.*, 521 U.S. at 594. When common questions "present a significant aspect of the case [that] can be resolved for all members of the class with a single adjudication," there is justification for "handling the dispute on representative rather than on an individual basis." *Delagarza v. Tesoro Ref. & Mktg. Co.*, No. C-09-5803 EMC, 2011 WL 4017967, at *10 (N.D. Cal. Sept. 8, 2011) (internal quotation marks and citation omitted).

The Court is satisfied that the core common questions in this case—the lawfulness of Defendants' policies and practices related to its commission payment system and reimbursement of reasonable business expenses—predominate over any differences regarding its implementation of those policies with respect to individual employees. Accordingly, the Court concludes that common questions of law and fact predominate.

### 2. Superiority

A class action is a superior means of adjudicating a dispute "[w]here classwide litigation of common issues will reduce litigation costs and promote greater efficiency." *Valentino*, 97 F.3d at 1234. In evaluating superiority, "courts consider the interests of the individual members in controlling their own litigation, the desirability of concentrating the litigation in the particular forum, and the manageability of the class action." *Hunt v. Check Recovery Sys., Inc.*, 241 F.R.D. 505, 514 (N.D. Cal. 2007), *modified*, 2007 WL 2220972 (N.D. Cal. Aug. 1, 2007), *aff'd sub nom.*, *Hunt v. Imperial Merch. Servs., Inc.*, 560 F.3d 1137 (9th Cir. 2009). A class action is superior to individual litigation in this matter for several reasons.

First, there is no indication that members of the proposed class have a strong interest in individual litigation or an incentive to pursue their claims individually, given the amount of damages likely to be recovered relative to the resources required to prosecute such an action. *See Chavez v. Blue Sky Nat. Beverage Co.*, 268 F.R.D. 365, 379 (N.D. Cal. 2010) (evaluating superiority under Rule 23(b)(3) and noting that "the class action is superior to maintaining individual claims for a small amount of damages"); *see also Gentry v. Superior Court*, 42 Cal. 4th 443, 457 (2007) (noting that "individual awards in wage-and-hour cases tend to be modest"),

*abrogation on other grounds recognized in Williams v. Superior Court*, 3 Cal. 5th 531, 558

(2017).  Second, any concerns over manageability of the class action in this case would not weigh

in favor of individual litigation given that Defendant's liability to "class members depends on

common proof" regarding its commission payment system and expense reimbursement policies.

*See Bowerman v. Field Asset Servs., Inc.*, 242 F. Supp. 3d 910, 936 (N.D. Cal. 2017) (recognizing

as legitimate the defendant's "apprehension regarding manageability," but finding it "insufficient

to tip the scales away from the superiority of proceeding as a class when [the defendant's] liability

to over 100 class members depends on common proof").  Finally, class actions are preferred in

wage-and-hour actions when individual employees may forgo pursuing their claims due to fear of

retaliation.  *See Williams*, 3 Cal. 5th at 558 (noting that fear of retaliation cuts in favor of

"facilitating collective action so that individual employees need not run the risk of individual

suits").

Accordingly, the Court concludes that conditional class certification for settlement

purposes is proper.

## II.  Preliminary Approval of the Settlement

In determining whether a settlement agreement is fair, adequate, and reasonable to all

concerned, courts generally consider the following factors:

> (1) the strength of the plaintiff's case; (2) the risk, expense,
> complexity, and likely duration of further litigation; (3) the risk of
> maintaining class action status throughout the trial; (4) the amount
> offered in settlement; (5) the extent of discovery completed and the
> stage of the proceedings; (6) the experience and views of counsel; (7)
> the presence of a governmental participant; and (8) the reaction of the
> class members of the proposed settlement.

*In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 946 (9th Cir. 2011) (quoting *Churchill*

*Vill., LLC v. Gen. Elec.*, 361 F.3d 566, 575 (9th Cir. 2004)).  However, when "a settlement

agreement is negotiated prior to formal class certification, consideration of these eight . . . factors

alone is" insufficient.  *Id.*  In such cases, courts must not only consider the above factors, but also

ensure that the settlement did not result from collusion among the parties.  *Id.* at 947.  Because

collusion "may not always be evident on the face of a settlement, . . . [courts] must be particularly

vigilant not only for explicit collusion, but also for more subtle signs that class counsel have

allowed pursuit of their own self-interests and that of certain class members to infect the negotiations." *Id.* In *Bluetooth*, the court identified three such signs:

> (1) when counsel receive a disproportionate distribution of the settlement, or when the class receives no monetary distribution but class counsel are amply rewarded;
>
> (2) when the parties negotiate a "clear sailing" arrangement providing for the payment of attorneys' fees separate and apart from class funds, which carries the potential of enabling a defendant to pay class counsel excessive fees and costs in exchange for counsel accepting an unfair settlement on behalf of the class; and
>
> (3) when the parties arrange for fees not awarded to revert to defendants rather than be added to the class fund.

*Id.* (internal quotation marks and citations omitted).

The Court cannot, however, fully assess such factors until after the final approval hearing; thus, "a full fairness analysis is unnecessary at this stage." *Alberto v. GMRI, Inc.*, 252 F.R.D. 652, 665 (E.D. Cal. 2008) (internal quotation marks and citation omitted). At the preliminary approval stage, "the settlement need only be potentially fair." *Acosta v. Trans Union, LLC*, 243 F.R.D. 377, 386 (C.D. Cal. May 31, 2007). Preliminary approval is thus appropriate if "the proposed settlement appears to be the product of serious, informed, noncollusive negotiations, has no obvious deficiencies, does not improperly grant preferential treatment to class representatives or segments of the class, and falls within the range of possible approval." *In re Tableware Antitrust Litig.*, 484 F. Supp. 2d 1078, 1079 (N.D. Cal. 2007) (internal quotation marks and citation omitted).

### A.     The Fairness Factors

#### 1.     Settlement Process

The first factor concerns "the means by which the parties arrived at settlement." *Harris v. Vector Mktg. Corp.*, No. C-08-5198 EMC, 2011 WL 1627973, at *8 (N.D. Cal. Apr. 29, 2011). To approve a proposed settlement, a court must be satisfied that the parties "have engaged in sufficient investigation of the facts to enable the court to intelligently make . . . an appraisal of the settlement." *Acosta*, 243 F.R.D. at 396. Courts thus have "an obligation to evaluate the scope and effectiveness of the investigation plaintiffs' counsel conducted prior to reaching an agreement."

*Id.*

In support of the instant motion, Plaintiffs submit the declaration of their counsel, Allyssa Villanueva. (*See* Dkt. No. 48-2.) Ms. Villanueva attests that the parties engaged in two rounds of private mediation with an experienced mediator prior to the settlement agreement, and "conducted discovery in advance of both mediations." (*Id.* at ¶ 3.) After the "[t]he first day of mediation was unsuccessful," the parties "conducted additional discovery, including hours of informal interviews of the named Plaintiffs, a key defense witness with direct knowledge of the facts relating to Plaintiffs' allegations, [and] non-party witnesses."[9] (*Id.* at ¶¶ 3-4.) The parties continued negotiating after the last mediation in February 2019, and Plaintiffs filed the Notice of Settlement a month later. (*Id.* at ¶¶ 11, 16, 18.) Ms. Villanueva attests that "[a]t all times, the [p]arties remained adverse, their negotiations were non-collusive, and at arm's length." (Dkt. No. 48-2 at ¶ 17.)

The use of an experienced private mediator and presence of discovery supports the conclusion that Plaintiffs were "armed with sufficient information about the case" to broker a fair settlement. *See Acosta*, 243 F.R.D. at 396; *see also Villegas*, 2012 WL 5878390, at *6 (finding two sessions of private mediation before an experienced mediator, which were "informed by . . . discovery," sufficient to "support the conclusion that the [p]laintiff was appropriately informed in negotiating a settlement"). Further, since Defendant removed this case to federal court in February 2018, the parties have drafted three joint case management conference statements, (*see* Dkt. Nos. 24, 30, 32), and participated in two case management conferences before the undersigned, (*see* Dkt. Nos. 26 & 33). The Settlement Agreement states that the parties "analyzed the exchanged discovery and data to assess potential liability and damages, as well the strength of

---

[9] With respect to the scope of discovery, the Settlement Agreement asserts: "Defendant produced over 500 pages of documents. [Defendant's] production included anonymized class-wide data reflecting training, signed commission agreements, signed sales policies, and business expense reimbursement information, for all class members during the class period. For a sample of class members, including Plaintiffs, [Defendant] also produced detailed personnel records and commissions statements reflecting how commissions were calculated. Additionally, [Defendant] produced information and documents reflecting company policies and practices. Defendant's Counsel interviewed each of the Plaintiffs in the presence of Class Counsel." (Dkt. No. 48-2, Ex. A at ¶ 22.)

their claims and likelihood of success on motions for class certification and summary judgment."

(Dkt. No. 48-2, Ex. A at ¶ 23.)  There is thus no indication that Plaintiffs rushed into settlement or

were otherwise ill-informed about the case and could not "reasonably assess its strengths and

value."  *See Acosta*, 243 F.R.D. 396.

On balance, the Settlement Agreement appears to be the product of serious, informed, non-

collusive negotiations.  This factor thus weighs in favor of preliminary approval.

### 2.      Obvious Deficiencies

The Court must next consider "whether there are obvious deficiencies in the Settlement

Agreement."  *See Harris*, 2011 WL 1627973, at *8.  The Court noted such deficiencies during the

two preliminary approval hearings and is satisfied that they have been sufficiently addressed to

permit preliminary approval.

### 3.      Lack of Preferential Treatment

The Court must next examine whether the Settlement Agreement "provides preferential

treatment to any class member."  *See Villegas*, 2012 WL 5878390, at *7.  Under the Settlement

Agreement, each class member may claim their pro rata share of the Net Settlement Amount based

on the number of workweeks worked during the class period less any applicable tax withholding

for the one-third of the individual Class Settlement Payments classified as wages.  (Dkt. No. 48-2,

Ex. A at ¶ 49.)  The Settlement Agreement further provides that the named Plaintiffs will also

receive a $2,000 service award.  (*Id.* at ¶ 54.)

At oral argument the Court questioned Plaintiffs regarding the proposed allocation plan

treating employees who were commissioned-only the same as employees who received a salary

plus commission.  Plaintiffs satisfactorily explained the reasoning behind the equal treatment.

"Incentive *awards* are fairly typical in class action cases."  *Rodriguez v. W. Publ'g Corp.*,

563 F.3d 948, 958 (9th Cir. 2009) (distinguishing incentive *awards* from incentive *agreements*, the

latter of which are "entered into as part of the initial retention of counsel" and "put class counsel

and the contracting class representatives into a conflict position from day one").  Incentive awards

"are intended to compensate class representatives for work done on behalf of the class, to make up

for financial or reputation risk undertaken in bringing the action, and, sometimes to recognize their

15

willingness to act as a private attorney general." *Id.* at 958-59.  Although incentive awards are viewed more favorably than incentive agreements, excessive awards "may put the class representative in a conflict with the class and present a considerable danger of individuals bringing cases as class actions principally to increase their own leverage to attain a remunerative settlement for themselves and then trading on that leverage in the course of negotiations." *Id.* at 960 (internal quotation marks and citation omitted).

Plaintiffs' motion asserts that the service awards are justified because the named Plaintiffs "assisted Plaintiffs' counsel with investigation of the claims," and "risked being responsible for Defendant's costs if the case was lost and having their future employment prospects damaged." (Dkt. No. 48 at 29.)  Although Plaintiffs submit no declarations or other evidence attesting to the quality or scope of the named Plaintiffs' representative service, the amount requested is comparable to amounts awarded by courts in this Circuit.  *See, e.g., In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 463 (9th Cir. 2000) (approving $5,000 to two plaintiff representatives of 5,400 potential class members in $1.75 million settlement); *Wren v. RGIS Inventory Specialists*, No. C-06-05778 JCS, 2011 WL 1230826, at *37 (N.D. Cal. Apr. 1, 2011) (approving $5,000 incentive awards to each of 24 named plaintiffs in $27,000,000 settlement); *Hopson v. Hanesbrands, Inc.*, No. CV-08-0844 EDL, 2009 WL 928133, at *10 (N.D. Cal. Apr. 3, 2009) (approving $5,000 award to one member of 217-member class in $408,420 settlement).  Further, the total amount of requested service awards ($8,000) represents 0.36 percent of the Gross Settlement Amount, which is well within the range that courts have found acceptable.  *See Sandoval v. Tharaldson Emp. Mgmt., Inc.*, No. EDCV 08-482-VAP (OPx), 2010 WL 2486346, at *10 (C.D. Cal. June 15, 2010) (collecting cases).

Accordingly, at this stage, there is no indication that the service award constitutes "preferential treatment" that would defeat preliminary approval.  The motion for final approval shall include evidence to support the requested awards.

### 4.     Range of Possible Approval

In determining whether the Settlement Agreement "falls within the range of possible approval," the Court must focus on "substantive fairness and adequacy" and "consider [P]laintiffs'

expected recovery balanced against the value of the settlement offer." *See Tableware*, 484 F. Supp. 2d at 1080. "[I]t is well-settled law that a proposed settlement may be acceptable even though it amounts only to a fraction of the potential recovery that might be available to class members at trial." *Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 527 (C.D. Cal. 2004).

Here, Ms. Villanueva attests to the parties' respective positions on "their exposure and risks on each claim." (*See* Dkt. No. 48-2 at ¶ 13.) The declaration addresses the Meal Claim (estimated exposure between $1 million and $5 million), Rest Claim (between $1 million and $5 million), Unpaid Wage Claim for Alleged Misclassification ($1 million), Overtime Off the Clock Work Claim ($750,000), Reimbursement Claim (mileage: $2 million; cell phone: $150,000 - $300,000), and Fraud Claims ($3 million), and discusses the methodology used to determine the estimated amount of exposure for each. (*Id.* at ¶ 13(a)(i)-(vi).) Ms. Villanueva attests that "[b]ased on the claim breakdowns, Plaintiffs estimated the total exposure to be at least $9 Million exclusive of interest and discretionary penalties." (*Id.* at ¶ 13(a)(vii).) Further, "[t]he Parties agree that the global exposure value based on discovery to date is between $9 Million and $11 Million dollars." (*Id.* at ¶ 15.)

The parties assert that the proposed Gross Settlement Amount of $2.2 million constitutes a 20% recovery of the high-end estimate of total potential damages and that the proposed Net Settlement Amount from which class members will be paid (approximately $1,417,400.00) constitutes a 13% recovery of the high-end estimate, for an approximate payout of $3,300.00 per class member (based on Plaintiffs' estimate of a putative class size of 429) on a non-reversionary basis. The Gross Settlement Amount, however, includes nearly $65,000 of Defendant's share of payroll taxes. This amount should be deducted from the Gross Settlement Amount because it goes to Defendant's separate obligation to the State and Federal governments, not to its alleged obligation to its employees. The Gross Settlement Amount is therefore $2,135,000-- approximately 19.4% of the high-end estimate of potential damages.

Ms. Villanueva's declaration discusses Defendant's specific arguments and potential defenses regarding the meal claims, rest claims, unpaid wage claims, reimbursement claims, and

fraud claims. (*See* Dkt. No. 48-2 at ¶ 13(b)(i)-(v).) Defendant denies liability on every claim and presented argument and evidence during settlement negotiations that Plaintiffs acknowledge "would present an uphill battle at class certification and at trial." (*Id.* at ¶ 13(b)(iii) (discussing defenses to unpaid wage claims for alleged misclassification).) According to Ms. Villanueva, Defendant also argued that even if Plaintiffs were to succeed on the merits as to some claims, any exposure "would be minimal" or "must be significantly discounted." (*Id.* at ¶ 13(i)-(ii) (discussing meal and rest claims).) The Court is persuaded that continued litigation rather than settlement presents risks to Plaintiffs regarding *any* recovery, much less recovery of less than the high-end estimate.

In sum, the risks and costs of continued litigation at least balance the benefit of the estimated payout to class members, warranting preliminary approval and comment from the class members.

***

Accordingly, consideration of the fairness factors warrants preliminary approval of the Settlement Agreement. The proposed settlement appears fair, adequate, reasonable, and in the best interests of the class members given the uncertainty of continued litigation.

### B. Class Notice Plan

For any class certified under Rule 23(b)(3), class members must be afforded "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B). Such notice must clearly state the following:

> (i) the nature of the action;
>
> (ii) the definition of the class certified;
>
> (iii) the class claims, issues, or defenses;
>
> (iv) that a class member may enter an appearance through an attorney if the member so desires;
>
> (v) that the court will exclude from the class any member who requests exclusion;
>
> (vi) the time and manner for requesting exclusion; and

(vii) the binding effect of a class judgment on members under Rule 23(c)(3).

Fed. R. Civ. P. 23(c)(2)(B). "Notice is satisfactory if it generally describes the terms of the settlement in sufficient detail to alert those with adverse viewpoints to investigate and to come forward and be heard." *Churchill*, 361 F.3d at 575 (internal quotation marks and citation omitted).

The notice requirements under Rule 23(c)(2)(B) are met. The Notice describes the allegations and claims in plain language,[10] defines a class member, includes contact information for both Plaintiffs' and Defendant's counsel and the Settlement Administrator, and summarizes the settlement amount and its distribution. The Notice further describes the options available to class members, including instructions for opting out of the settlement and filing an objection. It also informs class members that receiving a settlement award will release certain claims against certain parties and defines both "Released Claims" and "Released Parties." The Notice informs class members that they may appear at the final fairness hearing in person or through an attorney. (*See generally* Dkt. No. 52 at 1-8.) Finally, it directs class members to a website with more information, including the Settlement documents and pleadings.

The notice plan itself is also adequate. Within 20 days of preliminary approval Defendant will provide the Settlement Administrator with the class members' last known addresses. The Settlement Administrator must then mail the Notice to class members within 40 days of preliminary approval. Prior to mailing the Notice, the settlement administrator will run the list of class members through the "United States Postal Service's National Change of Address database," and if any Notices are returned as undeliverable, the Settlement Administrator will use skip-tracing to attempt to identify a valid address and re-mail the Notice. (Dkt. No. 48-2, Ex. A at ¶¶ 73, 75.) After mailing the Notice, the Settlement Administrator will provide weekly reports to both Plaintiffs' and Defendant's counsel identifying class members "whose mailings have been returned as undeliverable" and those "who have submitted Exclusion Requests or Notices of Objection." (*Id.* at ¶ 92.) Class members have 60 days from the mailing of the Notice to either

---

[10] The Notice's description of the allegations/claims itemizes eight allegations that roughly encompass the 15 claims brought in the FAC, except for the PAGA and UCL claims, which are otherwise noted in the Notice's list of statutes that Defendant allegedly violated. (*See* Dkt. No. 52 at 2 ¶ 2.)

opt out of the Settlement Agreement or file a notice of objection.  (*Id.* at ¶ 80, 88.)

The Notice, however, still does not adequately advise the Class of how it can review Class Counsel's written request for attorneys' fees and costs.  Accordingly, at the end of Section 18 of the Notice the following paragraph shall be added:

> Class counsel will apply in writing to the Court on or before **November 4, 2019** for their requested attorneys' fees and costs.  Their application will be available on the Settlement website: www.NorthstarSettlement.com within one day of its filing or upon request to Class Counsel.  You may object to the attorneys' fees and costs sought no later than **[60 days after Notice is mailed]** in accordance with Section 22 of this Notice.

## C.    Attorneys' Fees[11]

Rule 23(h) provides for an award of attorneys' fees and costs in a certified class action where it is "authorized by law or by the parties' agreement."  Fed. R. Civ. P. 23(h).  However, "courts have an independent obligation to ensure that the award, like the settlement itself, is reasonable, even if the parties have already agreed to an amount."  *Bluetooth*, 654 F.3d at 941; *see also Staton*, 327 F.3d at 963 ("[A] district court must carefully assess the reasonableness of a fee amount spelled out in a class action settlement agreement.").  Where a settlement produces a common fund for the benefit of the entire class, courts have discretion to employ either the lodestar method or the percentage-of-recovery method to determine whether the requested fees are reasonable.  *In re Mercury Interactive Corp. Sec. Litig.*, 618 F.3d 988, 992 (9th Cir. 2010).  The Ninth Circuit has established a benchmark of 25 percent of the common fund for attorneys' fees calculations under the latter method.  *See Powers v. Eichen*, 229 F.3d 1249, 1256 (9th Cir. 2000) ("We have . . . established twenty-five percent of the recovery as a 'benchmark' for attorneys' fees calculations under the percentage-of-recovery approach.").  Although "[a] district court may depart from the benchmark . . ., it must be made clear by the district court how it arrives at the figure ultimately awarded."  *Id.* at 1256-57.

"The lodestar figure is calculated by multiplying the number of hours the prevailing party

---

[11] The Settlement Agreement provides that "[i]f the Court awards less than the amount requested for the Class Counsel's attorneys' fees and expenses, the remainder will become part of the [Net Settlement Amount]" paid to class members.  (Dkt. No. 48-2, Ex. A at ¶ 62.)

reasonably expended on the litigation (as supported by adequate documentation) by a reasonable hourly rate for the region and for the experience of the lawyer." *Id.* at 941.  The resulting figure may be adjusted upward or downward to account for several factors, "including the quality of representation, the benefit obtained for the class, the complexity and novelty of the issues presented, and the risk of nonpayment." *Id.* at 941-42 (internal quotation marks and citation omitted).  The party requesting fees bears the burden "of submitting billing records to establish that the number of hours it requested are reasonable," *Gonzalez v. City of Maywood*, 729 F.3d 1196, 1202 (9th Cir. 2013), as well as "produc[ing] satisfactory evidence—in addition to the attorneys' own affidavits—that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation," *Camancho v. Bridgeport Fin., Inc.*, 523 F.3d 973, 980 (9th Cir. 2008) (internal quotation marks and citation omitted).  The Ninth Circuit recommends that whether the lodestar or percentage-of-recovery method is used, the district court perform a cross-check using the other method to confirm the reasonableness of the fee (e.g., if the percentage-of-recovery method is applied, a cross-check with the lodestar method will reveal if the amount requested is unreasonable in light of the hours reasonably expended).  *See id.* at 944-45.

As previously discussed, the Settlement Agreement provides for a maximum award of $736,200 in attorneys' fees (one-third of the Gross Settlement Amount).  Defendant does not oppose that award.  Plaintiffs' counsel asserts that the amount is reasonable based on:

> the award achieved on behalf of the class, the complexities of the factual and legal issues involved with Defendant's commission system and varying categories of potentially exempt and non exempt employees, and the time, skill, and experience required to analyze and navigate these issues effectively and successfully for Plaintiffs and the class.

(Dkt. No. 48 at 30.)  That is just argument, however, not evidence.  In support of an increase above the 25 percent benchmark, Plaintiffs must submit evidence—declarations, billing summaries, etc.— from which the Court could determine an appropriate lodestar figure to cross-check the amount requested.  *See Powers*, 229 F.3d at 1256-57 (noting that "[a] district court may depart from the benchmark," but "it must be made clear by the district court how it arrives at the

1    figure ultimately awarded").

2          Accordingly, Plaintiffs shall submit a motion for attorneys' fees including declarations and

3    detailed billing records so that the Court may determine an appropriate lodestar figure, and to

4    allow class members the opportunity to object to the requested fees.  *See In re Mercury Interactive*

5    *Corp.*, 618 F.3d at 995 (holding that class members must "have an adequate opportunity to oppose

6    class counsel's fee motion").

7          **D.     Costs**

8          "There is no doubt that an attorney who has created a common fund for the benefit of the

9    class is entitled to reimbursement of reasonable litigation expenses from that fund."  *Ontiveros v.*

10   *Zamora*, 303 F.R.D. 356, 375 (E.D. Cal. 2014) (internal quotation marks and citation omitted).  To

11   that end, district courts in this circuit regularly award litigation costs and expenses in wage-and-

12   hour class actions.  *See, e.g.*, *id.*; *Nwabueze v. AT&T Inc.*, No. C 09-01529 SI, 2014 WL 324262,

13   at *2 (N.D. Cal. Jan. 29, 2014); *LaGarde v. Support.com, Inc.*, No. C 12-0609, 2013 WL 1283325,

14   at *13 (N.D. Cal. Mar. 26, 2013).  Here, the Settlement Agreement provides that Plaintiffs'

15   counsel may obtain up to $20,000 in costs.

16         Plaintiffs' counsel is instructed to submit an itemized sheet summarizing costs with its

17   motion for attorneys' fees so that the Court can determine whether these costs are reasonable

18   litigation expenses incurred for the benefit of the class.

19                                  **CONCLUSION**

20         For the reasons set forth above, the Court GRANTS Plaintiffs' motion for preliminary

21   approval of the class action settlement as follows:

22         1.     Na'il Benjamin and Allyssa Villanueva of Benjamin Law Group, P.C. are

23                appointed as Class Counsel for the Settlement Class.

24         2.     Notice shall be provided in accordance with the notice plan and this Order.

25         3.     On or before November 4, 2019, Class Counsel shall file a motion seeking

26                approval of attorneys' fees and costs.

27         4.     The parties shall appear before this Court for a final approval hearing on February

28                20, 2020 at 9:00 a.m. in Courtroom F, 450 Golden Gate Ave., San Francisco,

California.

5.     Class Counsel shall file a noticed motion for final approval of settlement no later than 35 days before the final approval hearing.  The motion shall include a copy of the Notice ultimately sent to the class along with the other information, as available, suggested by the Northern District of California Procedural Guidance for Class Action Settlements.

**IT IS SO ORDERED.**

Dated: October 8, 2019

JACQUELINE SCOTT CORLEY
United States Magistrate Judge