UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| WILLIAM USCHOLD, et al., <br><br> Plaintiffs, <br><br> v. <br><br> NSMG SHARED SERVICES, LLC, <br><br> Defendants. | Case No. 18-cv-01039-JSC <br><br> **ORDER RE: MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND MOTION FOR ATTORNEYS' FEES, COSTS, AND CLASS REPRESENTATIVE INCENTIVE AWARDS** <br><br> Re: Dkt. Nos. 56, 58 |

Jose Almendarez, Tyrone Dangerfield, Tiana Naples, and William Uschold filed this state law wage-and-hour action on behalf of themselves and others similarly situated against their employer, NSMG Shared Services, LLC ("NSMG" or "Defendant").  (Dkt. No. 55.)[1]  Plaintiffs allege that NSMG violated California law in its operation of a commission payment system, among other violations of the California Labor Code.  Now before the Court is Plaintiffs' unopposed motion for attorneys' fees, (Dkt. No. 56), and motion for final approval of the parties' class action settlement agreement, (Dkt. No. 58).[2]  After reviewing the proposed settlement and with the benefit of the final approval hearing on March 5, 2020, the Court GRANTS the motion for final approval and GRANTS IN PART the motion for attorneys' fees and costs.

## BACKGROUND

### I.    The Parties

Defendant NSMG is a limited liability corporation organized under Delaware law; the

---

[1] Record citations are to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of the documents.

[2] All parties have consented to the jurisdiction of a magistrate judge pursuant to 28 U.S.C. § 636(c).  (Dkt. Nos. 9, 16, 60.)

United States District Court
Northern District of California

company maintains its principal place of business in Houston Texas.  (Dkt. No. 4 at ¶¶ 3-4.)  "NSMG employs individuals who provide funeral and burial related services throughout the Bay Area." (Dkt. No. 24 at 2.)  Plaintiffs are former employees of NSMG.  (Dkt. No. 55 at ¶¶ 19-22.)

## II.     Complaint Allegations

NSMG paid Plaintiffs using a "commission payment system."  (*Id.* at ¶ 2.)   Commission-earning employees were required to meet a weekly sales quota to earn the required number of "points" under the system.  (*Id.* at ¶ 3.)  If an employee failed to earn enough points to meet the quota in a given week, "the shortfall carried into the following week" and was added to the regular weekly requirement.  (*Id.* at ¶¶ 3-4.)  Employees could not earn a commission until they had satisfied the weekly quota and any shortfall from the previous week.  (*Id.* at ¶ 5.)  If an employee "exceeded the quota, the excess commission points were neither paid nor accumulated to offset further weeks."  (*Id.* at ¶ 6.)  Plaintiffs did not know the terms of the commission payment system or how it operated until several months into employment.  (*Id.* at ¶ 7.)  Further, NSMG "failed to ever adequately explain the compensation system and obtain a written agreement from each commission-earning employee reflecting all of the material terms and conditions of the commission structure."  (*Id.*)

NSMG further violated the California Labor Code by requiring commission-earning employees that earned hourly wages to work "'off of the clock' without compensation" for hours spent "on call, responding to calls from clients and employees," and client-related travel and meetings.  (*Id.* at ¶ 8.)  Additionally, NSMG misclassified commission-earning employees "under the outside sales overtime exemption, resulting in the failure to pay minimum wage and overtime premium wages."  (*Id.* at ¶ 9.)  NSMG also knew or required that its employees "use[ ] personal property for work including personal vehicles for travel to meet with clients and prospective clients and personal cell phones for business calls."  (*Id.* at ¶ 10.)  However, NSMG did not "reimburse all necessary and reasonable business expenses as required by California law."  (*Id.* at ¶ 11.)  NSMG also failed to provide "legally compliant meal and rest periods" and accurate wage statements, and "misclassified outside sales employees as exempt."  (*Id.* at ¶¶ 40-43.)  In addition to violating the California Labor Code, NSMG's acts "constitute unlawful and unfair business

2

1    practices in violation of California Unfair Competition Laws" ("UCL"), California Business &

2    Professions Code § 17200.  (*Id.* at ¶ 13.)

3         Plaintiffs "seek unpaid wages, reimbursement for necessary and reasonable business

4    expenses, statutory penalties, injunctive relief, attorneys' fees and costs, prejudgment interest, and

5    other relief the court may deem appropriate," as well as civil penalties under the Private Attorneys

6    General Act ("PAGA"), Cal. Lab. Code § 2698.  (*Id.* at ¶¶ 14-15.)

7    **III.    The Settlement Agreement**

8         **A.    The Class**

9         The class consists of "all employees paid commissions by Defendant . . . at any time from

10   January 17, 2014" through October 8, 2019, the date of preliminary approval of the settlement.

11   (Dkt. No. 58-1, Ex. A at ¶ 10.)  There are 449 class members.  (Dkt. No. 63, Ex. B at ¶ 5.)  As of

12   February 25, 2020, none of the class members have opted out, (*id.* at ¶ 11), and only one class

13   member has objected to the settlement, (Dkt. No. 61).

14        **B.    Payment Terms**

15        Defendant agrees to pay $2.2 million ("Gross Settlement Amount") to the Settlement

16   Administrator, who will deposit that amount in a qualified settlement fund.  (Dkt. No. 58-1, Ex. A

17   at ¶¶ 37-40.)  The following will be deducted from the Gross Settlement Amount: (1) payment of

18   $33,000 to the Labor Workforce Development Agency ("LWDA") to settle the PAGA claim

19   asserted in the FAC; (2) the Settlement Administrator's fees and costs, not exceeding $9,000.00;

20   (3) Plaintiffs' attorneys' fees (not exceeding $736,200.00 (representing one-third of the Gross

21   Settlement Amount)) and costs (not exceeding $20,000.00); (4) "Defendant's estimated share of

22   applicable payroll taxes to be paid on the individual settlement payments"; and (5) "Service

23   Awards" of $2,000.00 to each of the four named Plaintiffs.  (*Id.* at ¶¶ 41, 53, 54, 60, 68.)  The

24   remainder following those deductions constitutes the "Net Settlement Amount" from which

25   individual class members will be paid ("Class Settlement Payments").  (*Id.* at ¶¶ 41-42.)

26        In support of final approval, Plaintiffs submit the declaration of Jarrod Salinas, Case

27   Manager for Settlement Administrator Simpluris, who attests that as of February 25, 2020, the Net

28   Settlement Amount is estimated to be $1,308,298.17.  (Dkt. No. 63, Ex. B at ¶ 13.)  That amount

United States District Court
Northern District of California

reflects the Gross Settlement Amount ($2,200,000) minus the following: (1) attorneys' fees and costs not to exceed $736,200 and $20,000, respectively; (2) $7,500 in Settlement Administrator fees; (3) $8,000 in Service Awards; (4) $33,000 in PAGA penalties to the LWDA; and (5) 87,001.83 in "maximum employer payroll taxes."[3]  (*Id.*)

**1.    Class Settlement Payments**

The individual Class Settlement Payments for class members will be calculated as follows:

> (a) Each Class Member's "Total Individual Workweeks" will be determined on a pro-rata basis as determined by the number of workweeks each Class Member worked in the state of California from January 17, 2014 through the date of preliminary approval of the settlement.[4]

> (b) The Total Individual Workweeks for each Class Member will be aggregated to determine the "Total Class Gross Workweeks."

> (c) The estimated Individual Settlement Payment for each Class Member set forth in the Class Notice will be based on: (a) each Class Member's Total Individual Workweeks; (b) divided by the aggregate number of Total Class Gross Workweeks of all Class Members; (c) multiplied by the value of the Net Settlement Amount.

(Dkt. No. 58-1, Ex. A at ¶ 42(a)-(c).)  In other words, each class member will receive a pro-rata share of the Net Settlement Amount based on the number of weeks the individual worked compared to the number of weeks worked by all class members.

One-third of each Class Settlement Payment is allocated to wages, which are "subject to all applicable wage laws, including federal, state and local tax withholding and payroll taxes, and shall be reported on Form W-2."  (*Id.* at ¶ 49; *see also* Dkt. No. 58-3, Ex. C at 18 ("IRS W2 Forms will be issued to Class Members for the payments allocated to payment of wages.").)  The Settlement Administrator will issue the wage payments and calculate and withhold "all required federal, state and local taxes."  (Dkt. No. 58-1, Ex. A at ¶ 49.)  The remaining portion of each

---

[3] The Net Settlement Amount will increase, however, given that Class Counsel requests $186,200 less in attorneys' fees than the $736,200 provided for under the Settlement Agreement.  (*See* Dkt. No. 56 at 6 (requesting $550,000 in fees).)  Similarly, Class Counsel requests $12,431.44 in litigation costs, which is $7,568.56 less than the $20,000 provided for under the Settlement Agreement.  (*See id.*)  Thus, the actual Net Settlement Amount will exceed $1,500,000.

[4] The Settlement Agreement provides that "[e]ach Class Member's Total Individual Workweeks will be determined by reference to [Defendant's] records, subject to each Class Member's right to submit evidence in support of disputed claims."  (Dkt. No. 58-1, Ex. A at ¶ 42(c).)

Class Settlement Payment is divided evenly—one-third allocated to interest and one-third allocated to penalties "and other non-wage damages sought in the Action."  (*Id.*)  Those payments "will not have withholdings deducted"; instead, "IRS 1099 Forms will be issued" to class members.  (Dkt. No. 58-3, Ex. C at 18.)  Class members are ultimately "responsible for the appropriate payment of any federal, state and/or local income or payroll taxes on the Class Settlement Payments they receive and agree to indemnify and hold harmless Defendant for any tax liability arising out of or relating to" a class member's "failure to pay taxes on any amounts paid pursuant to [the] Settlement Agreement."  (Dkt. No. 58-1, Ex. A at ¶ 50.)

Mr. Salinas attests that as of February 25, 2020, the highest individual settlement payment to be distributed to the 449 class members "is approximately $9,236.48 and the average [payment] is approximately $2,913.80."[5]  (Dkt. No. 63, Ex. B at ¶ 13 (emphasis omitted).)  The Settlement Administrator will mail Class Settlement Payments by check to individual class members within ten days of the "Effective Date."[6]  (Dkt. No. 58-1, Ex. A at ¶ 43.)  The face of each check will state that it "must be cashed or deposited within" 180 days, and all payments will include a cover letter stating the same.  (*Id.*)  If a class member does not cash or deposit his or her check within 120 days of mailing, the Settlement Administrator will notify the class member by letter or postcard that the check will expire and become void if it is not "cashed or deposited within the remaining two months."  (*Id.* at ¶ 44.)  No later than 30 days after the 180-day period has passed, Plaintiffs' counsel "will report to the Court the total amount" paid to class members and any amount remaining in the qualified settlement fund.  (*Id.* at ¶ 63.)  The Settlement Agreement provides that the remaining amount will be distributed *cy pres* as follows: fifty percent to the charitable organization "Foundation for Advocacy Inclusion and Resources"; twenty-five percent to the California State Treasury "for deposit in the Trial Court Improvement and Modernization

---

[5] As previously discussed, the average individual payment will increase given that Class Counsel requests over $193,000 less than the fees and costs provided for under the Settlement Agreement. (*See* Dkt. No. 56 at 6.)

[6] The Settlement Agreement defines "Effective Date" as the later of: "(i) March 31, 2019, (ii) sixty-five (65) calendar days after the entry of the Final Approval Order(s) if no appeal or motion to set aside and vacate judgment is filed, or (iii) ten (10) business days after the final resolution of appeal or motion to set aside and vacate judgment if any such motion or appeal is filed and unsuccessful."  (Dkt. No. 58-1, Ex. A at ¶ 14.)

Fund"; and twenty-five percent "to the State Treasury for deposit into the Equal Access Fund of the Judicial Branch." (*Id.*) Plaintiffs assert that neither they nor Class Counsel "have any known relationships with any of the *cy pres* recipients." (Dkt. No. 58 at 12.) However, Plaintiffs "now contend that the State of California is the most appropriate recipient for unclaimed property," and Class Counsel "cannot present a strong argument in support of distributing unclaimed settlement funds to any entity other [than] the State of California." (*Id.*) No settlement funds will revert to Defendant. (Dkt. No. 58-1, Ex. A at ¶ 37.)

C.      **Notice**

Class Counsel Mr. Benjamin attests that following the Court's October 2019 order granting preliminary approval ("Preliminary Approval Order"), the Settlement Administrator, Simpluris, "received the class data file from defense counsel, which contained the name, social security number, last known mailing address, and other information sufficient to ensure adequate efforts were made to notify each known class member." (Dkt. No. 58-3 at ¶ 6.) Simpluris Case Manager Mr. Salinas attests that Simpluris received the class list containing data for 449 class members on November 8, 2019. (Dkt. No. 63, Ex. B at ¶ 5.) Simpluris "processed and updated" the Class List using the National Change of Address Database maintained by the U.S. Postal Service ("USPS") and mailed the Notice to the 449 class members on November 15, 2019 via first class mail. (*Id.* at ¶¶ 6-7.) 32 Notice packets were returned by the USPS with forwarding address information, and Simpluris re-mailed those Notice packets to the forwarding address. (Dkt. No. 63, Ex. B at ¶ 9.) 29 Notice packets were "returned by the USPS as undeliverable and without a forwarding address." (*Id.* at ¶ 10.) "Simpluris performed an advanced address search (i.e. skip trace) on all of these addresses by using Accurint," which utilized the class member's name, prior address, and social security number. (*Id.*) Simpluris located 24 updated addresses using this method and mailed the Notice to those addresses. (*Id.*) As of February 25, 2020, five Notices remain "undeliverable because Simpluris was unable to locate a current address." (*Id.*)

The Notice advised class members of the deadlines for opting out or objecting to the settlement (January 14, 2020) and the original date of the final approval hearing (February 20, 2020), as well as how members could obtain additional information about the settlement. (Dkt.

No. 58-3, Ex. C.)  The Notice also included a description of the lawsuit with an overview of the allegations and claims; a summary of the settlement amount, its distribution, and the methodology for calculating the individual Class Settlement Payments; and the release of claims.  (*Id.* at 14-21.) The Notice informed class members of their "Rights and Options"; specifically: (1) participate in the settlement by doing nothing and automatically receiving a Class Settlement Payment; or (2) opt-out by mailing a written and signed "Exclusion Request" to the Settlement Administrator within 60 days of the mailing of the Notice; or (3) object to the settlement by mailing a "Notice of Objection" to the Court within 60 days of the mailing of the Notice. (*Id.* at 20-21.)  The Notice also informed class members that they may attend the final approval hearing in person or through an attorney but are not required to do so.  (*Id.* at 21.)  The Notice provided Class Counsel and the Settlement Administrator's contact information and the web address for the settlement website created by Class Counsel.  (*Id.* at 15, 17.)  The website provides information regarding the lawsuit and settlement, "upcoming court dates," and makes available several filings, including the Notice, Settlement Agreement, Plaintiffs' motion for attorneys' fees and costs, and the Preliminary Approval Order.  *See* https://northstarsettlement.com/settlement-documents.

Class Counsel attests that on January 15, 2020, after the deadline for opting out or objecting, Simpluris confirmed "that none of the class members had opted out or objected to the . . . settlement."  (Dkt. No. 58-3 at ¶ 8.)  However, Class Counsel also "discovered on January 15, 2020 that the Court's [Preliminary Approval] Order had not been strictly followed"; specifically, the Notice did not include the following Court-ordered language:

> Class counsel will apply in writing to the Court on or before November 4, 2019 for their requested attorneys' fees and costs. Their application will be available on the Settlement website: www.NorthstarSettlement.com within one day of its filing or upon request to Class Counsel. You may object to the attorneys' fees and costs sought no later than [60 days after Notice is mailed] in accordance with Section 22 of this Notice.

(*Id.* at ¶¶ 9-10; *see also* Dkt. No. 54 at 20 (emphasis omitted).)  Upon discovering this omission, "Mr. Benjamin instructed Simpluris to mail an additional notice" ("Attorneys' Fees Notice") to class members explaining that Plaintiffs' motion for attorneys' fees "was filed on November 4, 2019 seeking fees in the amount of $550,000 . . ., and that the Court will consider Plaintiffs'

United States District Court
Northern District of California

1  motion at a hearing scheduled for February 20, 2020." (Dkt. No. 58-3 at ¶ 11.) The Attorneys'

2  Fees Notice directs class members to the settlement website to review the motion and informs

3  class members that they should submit to the Court written objections to the motion at their

4  "earliest opportunity, or at the hearing scheduled for February 20, 2020." (Dkt. No. 58-3, Ex. C at

5  13).

6         Simpluris mailed the Attorneys' Fees Notice to class members on January 23, 2020. (Dkt.

7  No. 63, Ex. B at ¶ 8.) In accordance with the Court's order on February 18, 2020, which

8  continued the final approval hearing to March 5, 2020, Class Counsel updated the settlement

9  website to include the actual Notice mailed to class members and provide notice that the final

10 approval hearing was rescheduled to March 5, 2020. (Dkt. No. 63 at ¶ 5.) As of February 25,

11 2020, Simpluris had "received no requests for exclusion from the Settlement" or objections.[7] (*Id.*

12 at ¶¶ 11-12.)

13         **D.     Release**

14         Class members agree to release Defendant from all claims, whether state or federal, arising

15 at any point during the "Settlement Period" (defined as January 17, 2014 through the date of

16 preliminary approval—October 8, 2019) that are asserted in the amended complaint or could have

17 been asserted based on the same nucleus of operative facts. (Dkt. No. 58-1, Ex. A at ¶¶ 13, 96-

18 100.) In addition, the named Plaintiffs agree to release all claims "that were or could have been

19 asserted by Plaintiffs which arise out of or relate in any way to their employment with NSMG,"

20 and a general release of all claims ("to the fullest extent they may be released under applicable

21 law") that arise "prior to the last day of the Settlement Period." (*Id.* at ¶¶ 101-02.) To effectuate

22 the general release, "Plaintiffs expressly waive and relinquish all rights and benefits [under]

23 California Civil Code section 1542." (*Id.* at ¶ 103.)

24 **III.    Procedural History**

25         Plaintiffs Tyrone Dangerfield and William Uschold initiated this action in the Superior

26 Court of California for the County of Alameda on January 17, 2018, asserting five claims for

27

28 _____
   [7] As discussed *infra* Discussion Section I.B.3, the Court received one objection concerning Class
   Counsel's attorneys' fees.

*United States District Court*
*Northern District of California*

relief: (1) unlawful collection of wages earned in violation of California Labor Code § 221; (2) unauthorized deductions in violation of California Labor Code § 224; (3) failure to reimburse for all necessary and reasonable business expenses in violation of California Labor Code § 2802; (4) failure to pay wages in violation of California Labor Code § 510 et seq.; and (5) violation of California Business & Professions Code § 17200.  (Dkt. No. 1, Ex. A.)  Defendant answered the complaint on February 15, 2018 and removed the case to this District on February 16, 2018, pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. §§ 1332(d), 1453.  (Dkt. No. 1 at 1.)

The parties participated in private mediation on October 24, 2018 and February 5, 2019 but were unable to reach a settlement agreement.  (Dkt. No. 56-1 at ¶¶ 3, 11.)  The parties continued to negotiate, however, and on March 8, 2019, Plaintiffs filed a Notice of Settlement.  (Dkt. No. 36.)  The terms of the settlement agreement are memorialized in the parties' Joint Stipulation of Class Settlement and Release (the "Settlement Agreement").  (*See* Dkt. No. 58-1, Ex. A.)  On October 8, 2019, the undersigned granted the parties' amended motion for preliminary approval of the Settlement Agreement.  (Dkt. No. 54.)  The Preliminary Approval Order appointed Na'il Benjamin and Allyssa Villanueva of Benjamin Law Group, P.C. as Class Counsel and directed them to file a motion seeking approval of attorneys' fees and costs by November 4, 2019.  (*Id.* at 22.)  Class Counsel did so.  (*See* Dkt. No. 56.)  The Order further set the date for a final approval hearing on February 20, 2020 and directed Class Counsel to file its motion for final approval no later than 35 days before that date.  (Dkt. No. 54 at 22-23.)

Pursuant to the Settlement Agreement, (*see* Dkt. No. 58-1, Ex. A at ¶ 19), Plaintiffs filed an amended complaint on October 29, 2019 ("FAC"), adding Plaintiffs Jose Almendarez and Tiana Naples, (*see* Dkt. No. 55).  The FAC also adds new factual allegations and additional claims that will be settled and released through the Settlement Agreement.  (*See id.*; *see also* Dkt. No. 58-1, Ex. A at ¶¶ 19, 33.)  The FAC brings claims for: (1) Unlawful Collection of Wages Earned, Cal. Lab. Code § 221; (2) Unauthorized Deduction, Cal. Lab. Code § 224; (3) Failure to Reimburse for Necessary and Reasonable Business Expenditures, Cal. Lab. Code § 2802; (4) Failure to Pay Wages, Cal. Lab. Code §§ 510, 1174; (5) Breach of Contract; (6) Fraud – Intentional

1   Misrepresentation; (7) Fraud – False Promise; (8) Failure to Pay Minimum Wages, Cal. Lab. Code

2   §§ 1194, 1197; (9) Failure to Provide Meal Periods, Cal. Lab. Code §§ 226.7, 512, 1198; (10)

3   Failure to Provide Rest Periods, Cal. Lab. Code §§ 226.7, 1198 and applicable Wage Orders; (11)

4   Failure to Provide Accurate Wage Statements, Cal. Lab. Code §§ 226, 226.3; (12) Failure to

5   Timely Pay Wages, Cal. Lab. Code § 204; (13) Failure to Timely Pay All Final Wages, Cal. Lab.

6   Code § 201-203; (14) violation of the UCL, Cal. Business & Professions Code § 17200; and (15)

7   violation of the PAGA, Cal. Lab. Code § 2698 *et seq.*  (Dkt. No. 55 at 1-2.)  The FAC tracks the

8   Settlement Agreement's language as to the proposed class and proposes 11 subclasses covering

9   the additional claims set forth in the FAC.  (*Id.* at ¶ 44 ("Plaintiffs believe that many or most Class

10  members are members of all subclasses.").)  Defendant answered the FAC and denies liability as

11  to each claim.  (*See generally* Dkt. No. 57.)

12      Plaintiffs filed the instant motion for final approval on January 16, 2020, (Dkt. No. 58).

13  Upon review of Plaintiffs' submissions, the Court determined that further information was needed

14  and issued an order vacating the hearing scheduled for February 20, 2020 and continuing it to

15  March 5, 2020, and directing Plaintiffs to file supplemental materials and update the settlement

16  website in accordance with the Court's Order.  (*See* Dkt. No. 62.)  Plaintiffs filed the requested

17  materials on February 25, 2020 and the Court held the final approval hearing as scheduled on

18  March 5, 2020.

19                              **DISCUSSION**

20      A class action settlement must be fair, adequate, and reasonable.  Fed. R. Civ. P. 23(e)(2).

21  Where, as here, parties reach an agreement before class certification, "courts must peruse the

22  proposed compromise to ratify both the propriety of the certification and the fairness of the

23  settlement." *Staton v. Boeing Co.*, 327 F.3d 938, 952 (9th Cir. 2003).  The approval of a class

24  action settlement takes place in two stages.  In the first stage of the approval process, the Court

25  preliminarily approves the settlement pending a fairness hearing, temporarily certifies a settlement

26  class, and authorizes notice to the class. *See Villegas v. J.P. Morgan Chase & Co.*, No. CV 09–

27  00261 SBA (EMC), 2012 WL 5878390, at *5 (N.D. Cal. Nov. 21, 2012).  The Court has done so

28  here.  (*See* Dkt. No. 54.)

United States District Court
Northern District of California

At the second stage, "after notice is given to putative class members, the Court entertains any of their objections to (1) the treatment of the litigation as a class action and/or (2) the terms of the settlement." *Ontiveros v. Zamora*, 303 F.R.D. 356, 363 (E.D. Cal. Oct. 8, 2014) (citing *Diaz v. Tr. Territory of Pac. Islands*, 876 F.2d 1401, 1408 (9th Cir. 1989)). Here, the Court is in receipt of one objection regarding Class Counsel's attorneys' fees and costs, (*see* Dkt. No. 61), and addresses that objection below. Following the final fairness hearing, the Court must reach a final determination as to whether the parties should be allowed to settle the class action pursuant to their agreed upon terms. *See Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 525 (C.D. Cal. 2004).

## I.      Motion for Final Approval

### A.      Final Certification of the Settlement Class

Class actions must meet the following requirements for certification:

> (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). In addition to meeting the requirements of Rule 23(a), a putative class action must also meet one of the conditions outlined in Rule 23(b)—as relevant here, the condition that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Prior to certifying the class, the Court must determine that Plaintiffs have satisfied their burden of demonstrating that the proposed class satisfies each element of Rule 23.

#### 1.      Rule 23(a) Requirements

The Preliminary Approval Order found that the putative class satisfied the numerosity, commonality, typicality, and adequacy of representation requirements under Rule 23(a). (Dkt. No. 54 at 9-10.) Since that time, the Court is unaware of any developments that would change its analysis, and neither Plaintiffs nor Defendant has indicated that such developments have occurred.

United States District Court
Northern District of California

1    Further, nothing in the amended complaint changes the Court's previous analysis.  Accordingly,

2    the Rule 23(a) requirements are met.

3            **2.    Rule 23(b) Requirements**

4            The Preliminary Approval Order likewise found that the prerequisites of Rule 23(b)(3)

5    were satisfied.  (*Id.* at 10-12.)  The Court is unaware of any changes that would alter its analysis,

6    and there was no indication in Plaintiffs' papers or at the fairness hearing that any such

7    developments had occurred.  Further, the only objection the Court received concerns the award of

8    attorneys' fees, (*see* Dkt. No. 61); there were no objections by individual class members who

9    claim to have an interest in controlling the prosecution of this action or related actions.  Finally,

10   the additional Plaintiffs and claims in the amended complaint do not alter the Court's previous

11   determination that there are no predominance or superiority concerns, because the challenged

12   employment practices are common to all class members based on the distinct subclasses set forth

13   in the FAC.  (*See* Dkt. No. 55 at ¶ 44.)  Accordingly, the Rule 23(b) requirements are met.

14           **3.    Rule 23(c)(2) Notice Requirements**

15           If the Court certifies a class under Rule 23(b)(3), it "must direct to class members the best

16   notice that is practicable under the circumstances, including individual notice to all members who

17   can be identified through reasonable effort."  Fed. R. Civ. P. 23(c)(2)(B).  Rule 23(c)(2) governs

18   both the form and content of the notice.  *See Ravens v. Iftikar*, 174 F.R.D. 651, 658 (N.D. Cal.

19   1997).  Although the notice must be "reasonably certain to inform the absent members of the

20   plaintiff class," Rule 23 does not require actual notice.  *Silber v. Mabon*, 18 F.3d 1449, 1454 (9th

21   Cir. 1994) (internal quotation marks and citation omitted).

22           As noted in the Preliminary Approval Order, the notice requirements under Rule

23   23(c)(2)(B) are met here.  The Notice describes the allegations and claims in plain language,[8]

24   defines a class member, includes contact information for Class Counsel and the Settlement

25   Administrator, and summarizes the settlement amount and its distribution.  The Notice further

26   _____

27   [8] The Notice's description of the allegations and claims itemizes nine allegations that roughly
     encompass the 15 claims brought in the FAC, except for the PAGA and UCL claims, which are

28   otherwise noted in the Notice's list of statutes that Defendant allegedly violated.  (*See* Dkt. No.
     58-3, Ex. C at 14-21.)

describes the options available to class members, including instructions for opting out of the settlement and filing an objection.  It also informs class members that receiving a settlement award will release certain claims against certain parties and defines both "Released Claims" and "Released Parties."  The Notice informs class members that they may appear at the final fairness hearing in person or through an attorney.  (*See generally* Dkt. No. 53-8, Ex. C at 1-8.)  Finally, it directs class members to a website with more information, including the settlement documents, motion for attorneys' fees, and pleadings.  And although the Notice does not include the language set forth in the Preliminary Approval Order regarding how class members can review Class Counsel's request for attorneys' fees and costs, (*see* Dkt. No. 54 at 20), Class Counsel corrected that deficiency by directing the Settlement Administrator to mail to class members the Attorneys' Fees Notice, which Simpluris did on January 23, 2020, (*see* Dkt. No. 63 at ¶ 4).

The Court is satisfied that the content of the Notice was sufficient under Rule 23(c)(2)(B). See *Churchill Village, L.L.C. v. General Electric*, 361 F.3d 566, 575 (9th Cir. 2004) ("Notice is satisfactory if it generally describes the terms of the settlement in sufficient detail to alert those with adverse viewpoints to investigate and to come forward and be heard.") (internal quotation marks and citation omitted).

***

Because the settlement class satisfies Rules 23(a) and 23(b)(3), and notice was sufficient in accordance with Rule 23(c), the Court grants final class certification.

### B.      Approval of the Settlement

Having certified the settlement class, the Court now addresses whether the terms of the parties' settlement are fair, adequate, and reasonable under Rule 23(e).  In making this determination, courts generally must consider the following factors: "(1) the strength of the plaintiff's case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a governmental participant; and (8) the reaction of the class members to the proposed settlement." *Churchill*, 361 F.3d at 575.  "This list is not exclusive and

different factors may predominate in different factual contexts." *Torrisi v. Tucson Elec. Power Co.*, 8 F.3d 1370, 1376 (9th Cir. 1993).  However, when "a settlement agreement is negotiated prior to formal class certification, consideration of these eight . . . factors alone is [insufficient]." *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 946 (9th Cir. 2011).  In such cases, courts must also ensure that the settlement did not result from collusion among the parties.  *Id.* at 946-47.

      As discussed below, a review of the fairness and *Bluetooth* factors indicates that the settlement is fair, adequate, and reasonable.

> ### 1.    The Fairness Factors
>
> #### a.  Strength of Plaintiffs' Case and Risk, Expense, Complexity, and Likely Duration of Further Litigation

      The Court first considers "the strength of the [P]laintiffs' case on the merits balanced against the amount offered in the settlement."  *See DIRECTV, Inc.*, 221 F.R.D. at 526 (internal quotation marks and citation omitted).  Although this action reached settlement before the Court had occasion to consider the merits of Plaintiffs' claims, the Court need not reach an ultimate conclusion about the merits of the dispute now, "for it is the very uncertainty of outcome in litigation and avoidance of wasteful and expensive litigation that induce consensual settlements." *Officers for Justice v. Civil Serv. Comm'n of City & Cty. of San Francisco*, 688 F.2d 615, 625 (9th Cir. 1982).  To that end, there is no "particular formula by which th[e] outcome must be tested." *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 965 (9th Cir. 2009).  Rather, the Court's assessment of the likelihood of success is "nothing more than an amalgam of delicate balancing, gross approximations and rough justice."  *Id.* (internal quotation marks and citation omitted).  "In reality, parties, counsel, mediators, and district judges naturally arrive at a reasonable range for settlement by considering the likelihood of a plaintiffs' or defense verdict, the potential recovery, and the chances of obtaining it, discounted to a present value."  *Id.*

      Here, the FAC alleges multiple Labor Code violations, common law fraud and breach of contract claims, and claims under the UCL and PAGA.  (*See generally* Dkt. No. 55.)  Although Plaintiffs believe their claims are meritorious, Class Counsel Ms. Villanueva's declaration

United States District Court
Northern District of California

discusses Defendant's specific arguments and potential defenses regarding the meal claims, rest claims, unpaid wage claims, reimbursement claims, and fraud claims.  (*See* Dkt. No. 58-1 at ¶¶ 13(b)(i)-(v).)  Defendant's answer to the FAC likewise denies liability on every claim.  (*See* Dkt. No. 57 at 9-14.)  Ms. Villanueva attests that during settlement negotiations Defendant presented argument and evidence that "would present an uphill battle at class certification and at trial."  (*Id.* at ¶ 13(b)(iii) (discussing defenses to unpaid wage claims for alleged misclassification; *see also id.* at ¶¶ 13(b)(i),(ii),(iv) (discussing defenses on the merits and to class certification).)  According to Ms. Villanueva, Defendant also argued that even if Plaintiffs were to succeed on the merits as to some claims, any exposure "would be minimal" or "must be significantly discounted."  (*Id.* at ¶¶ 13(i),(ii) (discussing meal and rest claims).)  Class Counsel Mr. Benjamin attests to "significant legal uncertainties associated with Plaintiffs' meal period and off-the-clock claims as well as the prayer for punitive damages for 'willful' violations."  (Dkt. No. 56-2 at ¶ 25.)  Mr. Benjamin further attests that "[e]vidence proved that Defendant was compliant for at least certain time periods within the Class period and with certain putative Class members," thus "abridging the scope and duration of some of Plaintiffs' claims."  (*Id.*)

Given the risks and costs of continued litigation, the immediate reward to class members through settlement is preferable.  Class members will receive a pro-rata share of the Net Settlement Amount based on the number of weeks the individual worked compared to the number of weeks worked by all class members.  (*See* Dkt. No. 58-1, Ex. A at ¶¶ 42(a)-(c).)  The average class member payout is $2,913.80 with the highest payment estimated at $9,236.48.  (Dkt. No. 63, Ex. B at ¶ 13 (emphasis omitted).)  The benefit of receiving this money now rather than later at some unidentified and uncertain time has its own value.

The challenges Plaintiffs would face should this case move forward instead of settling, in contrast to the finality and speed of recovery under the parties' agreement, weighs in favor of approving the settlement.

**b.  Risk of Maintaining Class Action Status Throughout Trial**

In considering the third factor, the Court looks to the risk of maintaining class certification if the litigation were to proceed.  As discussed above, NSMG has represented that it will present

United States District Court
Northern District of California

1    evidence opposing class certification and that Plaintiffs' meal and rest break, unpaid wage claims

2    for alleged misclassification, and reimbursement claims will be difficult to prove on a class-wide

3    basis.  (Dkt. No. 58-1 at ¶¶ 13(b)(i)-(iv).)  In light of these difficulties in certifying the class, the

4    Court finds that this factor weighs in favor of approving the settlement.

### c.  Settlement Amount

6        The fourth fairness factor, the amount of recovery offered, also favors final approval of the

7    settlement.  When considering the fairness and adequacy of the amount offered in settlement, "it is

8    the complete package taken as a whole, rather than the individual component parts, that must be

9    examined for overall fairness."  *DIRECTV, Inc.*, 221 F.R.D. at 527.  "[I]t is well-settled law that a

10   proposed settlement may be acceptable even though it amounts to only a fraction of the potential

11   recovery that might be available to the class members at trial."  *Id.* (collecting cases).

12       The Settlement Administrator estimates that the Net Settlement Amount is $1,308,298.17

13   after deducting attorneys' fees and litigation costs, incentive awards, administration fees, payment

14   to LWDA, and payroll taxes from the Gross Settlement Amount of $2,200,000.  (Dkt. No. 63, Ex.

15   B at ¶ 13.)  The Settlement Administrator further estimates that the average individual settlement

16   payment "is approximately $2,913.80."  (*Id.*)  Class Counsel attests that the parties agree that the

17   value of the claims "is between $9 Million and $11 Million."  (Dkt. No. 58-1 at ¶ 15.)  Thus, the

18   Net Settlement Amount reflects a 12% recovery of the high-end estimate of potential damages.  In

19   granting preliminary approval the Court concluded that the estimated payout to class members was

20   fair in relation to the risks of continued litigation, (*see* Dkt. No. 54 at 17-18), and there is nothing

21   in the final approval materials that changes the Court's analysis on that score.  Further, and as

22   previously discussed, the Net Settlement Amount will increase because Class Counsel is

23   requesting over $193,000.00 less than is provided for under Settlement Agreement for attorneys'

24   fees and litigation costs.

25       Finally, no class member has opted out of the settlement.  Although class members were

26   not required to submit a claim to recover, that "the overwhelming majority of the class willingly

27   approved the offer and stayed in the class presents at least some objective positive commentary as

28   to its fairness."  *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1027 (9th Cir. 1998), *overruled on*

*other grounds by Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011).  The Court therefore

concludes that the amount offered in settlement also weighs in favor of final approval.

### d.  Extent of Discovery Completed and Stage of Proceedings

In the context of class action settlements, as long as the parties have sufficient information

to make an informed decision about settlement, "formal discovery is not a necessary ticket to the

bargaining table."  *Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1239 (9th Cir. 1998).  Rather,

a court's focus is on whether "the parties carefully investigated the claims before reaching a

resolution."  *Ontiveros*, 303 F.R.D. at 371.  Here, the parties exchanged discovery in advance of

private mediation with an experienced mediator in October 2018.  (*See* Dkt. No. 58-1 at ¶ 3.)

After the first mediation was unsuccessful, the parties spent several months engaging in additional,

extensive discovery in preparation for another round of mediation in February 2019.  (*Id.* at ¶¶ 4-

11.)  NSMG provided Plaintiffs with discovery regarding the number of class members, its

policies and procedures, timekeeping data, and payroll data.  (*Id.* at ¶ 7.) The parties thereafter

participated in another round of private mediation and continued to negotiate before reaching a

settlement agreement in March 2019.  (*Id.* at ¶¶ 11-16.)  Under these circumstances, the extent of

discovery in this case favors approval of the settlement.

### e.  Experience and Views of Counsel

The experience and views of counsel also weigh in favor of approving the settlement.

Class Counsel Mr. Benjamin attests that he has experience litigating class actions, including

"employment law class actions."  (*See* Dkt. No. 56-2 at ¶¶ 4-6.)  He has also "tried close to a

dozen matters," including employment matters, and has experience litigating and resolving wage-

and-hour claims under the California Labor Code.  (*Id.* at ¶¶ 8-9.)  Mr. Benjamin's firm focuses on

"Labor and Employment matters" and it has "resolved more than 300 [p]laintiff's-side

employment matters," including "multi-plaintiff matters, representative actions, and matters that

had the potential to be class matters but . . . were resolved individually due to the individualized

nature of the clients' claims."  (*Id.* at ¶ 10.)  Class Counsel Ms. Villanueva has nearly four years of

experience litigating employment law matters in California.  (*See* Dkt. No. 56-1 at ¶¶ 4-6.)

Defendant is represented by an international law firm with 10 offices in California that "has

United States District Court
Northern District of California

defended clients in more than 1,700 employment-related class and collective actions" in the past five years.  *See* https://www.littler.com/practice-areas/class-actions.

Class Counsel attests that they thoroughly investigated Plaintiffs' claims, exchanged extensive discovery with Defendant, and engaged in two rounds of private mediation before reaching a settlement that is fair and reasonable to the Class given the legal uncertainties underlying Plaintiffs' claims and risks of continued litigation.  (*See generally* Dkt. Nos. 56-2 & 58-1; *see also* Dkt. No. 58 at 18 ("In the face of Defendant['s] competing arguments and the potential uncertainties, Plaintiffs' Counsel believes that the agreed-upon settlement fairly compensates Class Members for wages and penalties allegedly owed.").)  Class Counsel's experience in California wage-and-hour litigation and their assertion that the settlement is fair, adequate, and reasonable supports final approval of the settlement.  *See Hanlon*, 150 F.3d at 1026; *see also DIRECTV, Inc.*, 221 F.R.D. at 528 ("Great weight is accorded to the recommendation of counsel, who are most closely acquainted with the facts of the underlying litigation.") (internal quotation marks and citation omitted).

### f.  Presence of a Government Participant

No government entity is a party to this action; however, because Defendant removed this case pursuant to CAFA, it was required to provide notice of the proposed settlement to the relevant state and federal officials pursuant to 28 U.S.C. § 1715(b).  *See Chan Healthcare Grp., PS v. Liberty Mut. Fire Ins. Co.*, 844 F.3d 1133, n.2 ("In addition to §§ 1332(d) and 1453, CAFA also includes §§ 1711-1715, which relate to approval of settlements in class actions.").  Defendant served the requisite notice on March 2, 2020.  (*See* Dkt. No. 65.)  As of the date of this Order, no government entity has raised an objection to the proposed settlement.  *See* 28 U.S.C. § 1715(d) (providing that a court may not grant final approval of a class action settlement in a CAFA case until 90 days after the parties give the notice required by section 1715(b)).

### g.  Reaction of Class Members

The Settlement Administrator attests that 449 class members were mailed notice of the settlement, and notice was ultimately unsuccessful as to five class members.  (See Dkt. No. 63, Ex. B at ¶¶ 7, 10.)  As of the final approval hearing, the Court received one objection concerning

18

the award of attorneys' fees.  (*See* Dkt. No. 61.)  "Courts have repeatedly recognized that the

absence of a large number of objections to a proposed class action settlement raises a strong

presumption that the terms of a proposed class settlement action are favorable to the class

members."  *Garner v. State Farm Mut. Auto. Ins. Co.*, No. CV 08 1365 CW (EMC), 2010 WL

1687832, at *14 (N.D. Cal. Apr. 22, 2010) (internal quotation marks and citation omitted).  Thus,

the Court "may appropriately infer that a class action settlement is fair, adequate, and reasonable

when few class members object to it.  *Id.* (internal quotation marks and citation omitted).

In sum, the fairness factors weigh in favor of granting Plaintiffs' motion for final approval

of the class action settlement.

### 2.     The *Bluetooth* Factors

Given that this settlement was reached prior to class certification, the Court must look

beyond the *Churchill* factors and examine the settlement for evidence of collusion with an even

higher level of scrutiny.  *See Bluetooth*, 654 F.3d at 946.  The question here is whether the

settlement was the result of good faith, arms-length negotiations or fraud and collusion.  *See id.*  In

determining whether the settlement is the result of collusion, courts "must be particularly vigilant

not only for explicit collusion, but also for more subtle signs that class counsel have allowed

pursuit of their own self-interest and that of certain class members to infect the negotiations."  *Id.*

at 947.  The Ninth Circuit has identified three such signs:

> (1) when counsel receive a disproportionate distribution of the
> settlement, or when the class receives no monetary distribution but
> class counsel are amply rewarded;
>
> (2) when the parties negotiate a "clear sailing" arrangement providing
> for the payment of attorneys' fees separate and apart from class funds,
> which carries the potential of enabling a defendant to pay class
> counsel excessive fees and costs in exchange for counsel accepting an
> unfair settlement on behalf of the class; and
>
> (3) when the parties arrange for fees not awarded to revert to
> defendants rather than be added to the class fund.

*Id.* at 947 (internal quotation marks and citations omitted).

Here, one of the three warning signs that the Ninth Circuit identified is present—a "clear

sailing" provision in the Settlement Agreement.  However, for the reasons described below the

1   Court finds no evidence of collusion, despite the existence of the clear sailing provision. *See id.* at

2   950 (noting that upon remand the district court may uphold the settlement notwithstanding the

3   presence of all three of the *Bluetooth* warning signs).

4       First, the Court compares the payout to the class—the Net Settlement Amount—to Class

5   Counsel's unopposed fees under the Settlement Agreement. *See Harris v. Vector Mktg. Corp.*, No

6   C-08-5198 EMC, 2011 WL 4831157, at *6 (N.D. Cal. Oct. 12, 2011) (examining "whether a

7   disproportionate part of the settlement is being awarded to class counsel" under the settlement

8   agreement).  The Settlement Agreement provides for a maximum award of $736,200 in attorneys'

9   fees (33% of the Gross Settlement Amount of $2,200,000).  (Dkt. No. 58-1, Ex. A at ¶ 59.)

10  However, Plaintiffs' motion for attorneys' fees requests less than that amount—$550,000 (25% of

11  the Gross Settlement Amount).  The Ninth Circuit has identified 25% of the total settlement as a

12  reasonable benchmark for attorneys' fees, *see Powers v. Eichen*, 229 F.3d 1249, 1256 (9th Cir.

13  2000), and the Court concludes that the amount requested is not disproportionate to, and is indeed

14  less than, the actual Net Settlement Amount, which will exceed $1,500,000.  Accordingly, the

15  amount of Class Counsel's award relative to the payout to the class does not evince collusion.

16      The second warning sign—a clear sailing provision—is present: the Settlement Agreement

17  provides that Defendant will not oppose an award to Class Counsel of $736,200 in attorneys' fees,

18  to be paid from the Gross Settlement Amount.  (*See* Dkt. No. 58-1, Ex. A at ¶ 59.)  "[T]he very

19  existence of a clear sailing provision increases the likelihood that class counsel will have

20  bargained away something of value to the class." *Bluetooth*, 654 F.3d at 948 (alteration in

21  original) (internal quotation marks and citation omitted).  Thus, the Court "has a heightened duty

22  to peer into the provision and scrutinize closely the relationship between attorneys' fees and

23  benefit to the class, being careful to avoid unreasonably high fees simply because they are

24  uncontested." *Id.* (internal quotation marks and citation omitted).  The Court concludes that the

25  existence of the clear sailing provision on its own does not evince collusion, because the fees

26  awarded are not "unreasonably high," but instead fail within the 25% benchmark established by

27  the Ninth Circuit.  Further, the fees are not disproportionate to the class payout.

28      Finally, the third warning sign—whether the parties have arranged for fees not awarded to

the class to revert to defendants rather than be added to the class fund, *see Bluetooth,* 654 F.3d at 948—is not present here.  Instead, the non-reversionary Settlement Agreement provides that any fees not awarded become part of the Net Settlement Amount to be distributed to class members. (*See* Dkt. No. 58-1, Ex. A at ¶ 62 ("If the Court awards less than the amount requested for the Class Counsel's attorneys' fees and expenses, the remainder will become part of the [Net Settlement Amount].").)

Notwithstanding the existence of the clear sailing provision, the Court finds that the settlement did not result from, and was not influenced by, collusion.  First, the Settlement Agreement adequately satisfies the class members' claims, which is reflected in part by the existence of only one objection to the settlement.  (*See* Dkt. No. 61 (objecting to "taking the attorney's fee from [the] settlement [amount]," and asserting that the fee should instead "be solely . . . billed to [Defendant] alone").)  Second, the Court finds no evidence of explicit collusion here, where the parties exchanged discovery and engaged in settlement discussions overseen by an experienced neutral mediator before agreeing on this settlement.  Class Counsel attests that "[a]t all times, the Parties[ ] remained adverse, their negotiations were non-collusive, and at arm's length."  (Dkt. No. 58-1 at ¶ 17.)  Based on the nature of the mediation process and the parties' conduct during this litigation, the Court is satisfied that the Settlement Agreement is the product of serious, informed, non-collusive negotiations.

The eight fairness factors suggest that the settlement is fair, adequate and reasonable, and the Court is satisfied that the settlement was not the result of collusion between the parties.  As discussed below, the lone objection to the proposed settlement does not change the Court's determination.  (*See* Dkt. No. 61.)

### 3.   Objection

Class member Maria Lara objects to paying the attorneys' fees "from [her] settlement" and asserts that Defendant should pay such fees on its own.  (*Id.*)  As previously discussed, the Settlement Agreement's attorneys' fees provision states that such fees are paid from the Gross Settlement Amount, not the Net Settlement Amount from which class members receive their individual payments.  Payment of attorneys' fees from the Gross Settlement Amount is

1    appropriate. *See Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980) ("[A] litigant or a lawyer

2    who recovers a common fund for the benefit of persons other than himself or his client is entitled

3    to a reasonable attorney's fee from the fund as a whole.").

4          Accordingly, the Court concludes that final approval is appropriate.

5    **II.    Motion for Attorneys' Fees, Costs, and Class Representative Incentive Awards**

6          As previously discussed, the Settlement Agreement provides for a maximum of $736,200

7    (one-third of the Gross Settlement Amount), "in a specific amount to be determined by the Court,"

8    to cover Class Counsel's attorneys' fees. (Dkt. No. 58-1, Ex. A at ¶ 60.) The Settlement

9    Agreement further provides for reimbursement of Class Counsel's litigation expenses, up to

10   $20,000. (*Id.*) Finally, the Settlement Agreement provides that the named Plaintiffs will each

11   receive a $2,000 "Service Award" for their time and effort in prosecuting this lawsuit. (*Id.* at ¶

12   54.) The Court addresses in turn Plaintiffs' motion for attorneys' fees, litigation costs, and

13   incentive awards.

14         **A.    Attorneys' Fees**

15         "While attorneys' fees and costs may be awarded in a certified class action where so

16   authorized by law or the parties' agreement, Fed. R. Civ. Pro. 23(h), courts have an independent

17   obligation to ensure that the award, like the settlement itself, is reasonable, even if the parties have

18   already agreed to an amount." *Bluetooth*, 654 F.3d at 941. In diversity actions such as this, state

19   law applies to determine the right to fees and the method for calculating them. *See Mangold v.*

20   *California Pub. Utils. Comm'n*, 67 F.3d 1470, 1478-79 (9th Cir. 1995). As Plaintiffs' underlying

21   claims are state law claims, the Court must apply California law on attorneys' fees. *See Vizcaino*

22   *v. Microsoft Corp.*, 290 F.3d 1043, 1047 (9th Cir. 2002).

23         The California Supreme Court has held that courts have discretion to choose among two

24   different methods for calculating a reasonable attorney's fee award. *See Laffitte v. Robert Half*

25   *Int'l Inc.*, 1 Cal. 5th 480, 504 (2016). The first is the "percentage method," where the fee is

26   calculated "as a percentage share of a recovered common fund or the monetary value of [the]

27   plaintiffs' recovery." *Id.* at 489. The second approach is "[t]he lodestar method, or more

28   accurately the lodestar–multiplier method." *Id.* at 489. Under the lodestar method, the fee is

United States District Court
Northern District of California

calculated "by multiplying the number of hours reasonably expended by counsel by a reasonable hourly rate," then "increas[ing] or decreas[ing]" the lodestar figure based on "a variety of . . . factors, including the quality of the representation, the novelty and complexity of the issues, the results obtained, and the contingent risk presented." *Id.* (citation omitted). "The choice of a fee calculation method is generally one within the discretion of the trial court, the goal under either the percentage or lodestar approach being the award of a reasonable fee to compensate counsel for their efforts." *Id.* at 504. This approach aligns with the Ninth Circuit. *See Vizcaino*, 290 F.3d at 1047 ("Under Ninth Circuit law, the district court has discretion in common fund cases to choose either the percentage-of-the-fund or the lodestar method.").

Both the California Supreme Court and the Ninth Circuit recommend that whether a court uses the lodestar or percentage-of-recovery method, the court should perform a cross-check using the other method to confirm the reasonableness of the fee (e.g., if the percentage-of-recovery method is applied, a cross-check with the lodestar method will reveal if the amount requested is unreasonable in light of the amount of work done). *See, e.g., Bluetooth*, 654 F.3d at 944-45; *Laffitte*, 1 Cal. 5th at 504 ("A lodestar cross-check . . . provides a mechanism for bringing an objective measure of the work performed into the calculation of a reasonable attorney fee.").

### 1.   Percentage-of-Recovery Method

Plaintiffs request $550,000 in fees, representing 25% of the $2.2 million Gross Settlement Amount. Defendant does not oppose the request; nor has the Court received any objections from class members regarding the *amount* requested in Plaintiffs' motion for attorneys' fees. The 25% figure aligns with the "benchmark" established by the Ninth Circuit "for attorneys' fees calculations under the percentage-of-recovery approach." *Powers*, 229 F.3d at 1256. However, the Court cannot simply apply the benchmark rate but must instead consider "all of the circumstances of the case" to determine whether it is appropriate. *See Vizcaino*, 290 F.3d at 1048 ("[C]ourts cannot rationally apply any particular percentage—whether 13.6 percent, 25 percent or any other number—in the abstract, without reference to all the circumstances of the case.") (internal quotation marks and citation omitted). Relevant circumstances include "exceptional results for the class"; "complexity of the issues and the risks" of litigation; and counsel's financial

23

United States District Court
Northern District of California

1    burden in litigating the case (i.e., contingent fee agreement and time and expense).  *Id.* at 1048-50.

2           Here, however, even if all of those factors arguably weigh in favor of Plaintiffs' requested

3    award, the lodestar cross-check demonstrates that a 25% award is unreasonable in this case based

4    on the hours Class Counsel actually expended.  *See Bluetooth*, 654 F.3d at 942-43 (noting that

5    where a 25% award "would yield windfall profits for class counsel in light of the hours spent on

6    the case, courts should adjust the benchmark percentage or employ the lodestar method instead");

7    *see also Laffitte,* 1 Cal. 5th at 504 ("[T]he goal under either the percentage or lodestar approach

8    [is] the award of a reasonable fee to compensate counsel for their efforts.").  Thus, the Court in its

9    discretion will initially apply the lodestar method.

                              **2.      Lodestar Method**

11          The lodestar figure consists of "the number of hours reasonably expended multiplied by

12   the reasonable hourly rate."  *PLCM Grp. v. Drexler*, 22 Cal. 4th 1084, 1095 (2000).  A reasonable

13   hourly rate is defined as "that prevailing in the community for similar work."  *Id.*  As to the

14   computation of hours, "trial courts must carefully review attorney documentation of hours

15   expended."  *Ketchum v. Moses*, 24 Cal. 4th 1122, 1132 (2001).

                              **a.      Reasonable Rate**

17          To determine whether counsel's hourly rates are reasonable, the Court looks to the "hourly

18   amount to which attorneys of like skill in the area would typically be entitled."  *Ketchum*, 24 Cal.

19   4th at 1133.  "The fee applicant has the burden of producing satisfactory evidence, in addition to

20   the affidavits of its counsel, that the requested rates are in line with those prevailing in the

21   community for similar services of lawyers of reasonably comparable skill and reputation."  *Jordan*

22   *v. Multnomah Cty.*, 815 F.2d 1258, 1263 (9th Cir.1987).  In addition, Civil Local Rule 54-5(b)(3)

23   requires the party seeking fees to submit "[a] brief description of relevant qualifications and

24   experience and a statement of the customary hourly charges of each such person or of comparable

25   prevailing hourly rates or other indication of value of the services."

26          Plaintiffs submit the declarations of Mr. Benjamin and Ms. Villanueva in support of their

27   request for fees.  Ms. Villanueva is a litigation associate at Benjamin Law Group, P.C.; she holds a

28   bachelor's degree from the University of California ("UC), San Diego, and a J.D. from UC

                                          24

1   Hastings College of the Law.  (Dkt. No. 56-1 at ¶¶ 2, 6.)  She has nearly four years of experience

2   litigating California employment law matters.  (*Id.* at ¶¶ 4-6.)  Her "standard litigation rate is

3   $375.00 per hour."  (*Id.* at ¶ 7.)  Mr. Benjamin is "the Managing Partner of Benjamin Law Group,

4   P.C."  (Dkt. No. 56-2 at ¶ 2.)  He earned his bachelor's degree from UC Berkeley and his J.D.

5   from UC Hastings; he has nearly six years of experience litigating California employment law

6   matters.  (*Id.* at ¶¶ 3-13.)  His standard rate "is $475.00 per hour."  (*Id.* at ¶ 20.)

7        These billing rates are reasonable and in line with prevailing rates in this district for

8   lawyers of comparable experience, skill, and reputation.  *See, e.g., Roberts v. Marshalls of CA,*

9   *LLC*, No. 13-cv-04731-MEJ, 2018 WL 510286, at *14-15 (N.D. Cal. Jan. 23, 2018) (approving

10  rates between $300 and $750 per hour); *In re Magsafe Apple Power Adapter Litig.*, No. 5:09-CV-

11  01911-EJD, 2015 WL 428105, at *12 (N.D. Cal. Jan. 30, 2015) ("In the Bay Area, reasonable

12  hourly rates for partners range from $560 to $800, for associates from $285 to $510, and for

13  paralegals and litigation support staff from $150 to $240.") (collecting cases).

### b.      Hours Expended

15       Ms. Villanueva attests that she "personally expended 35.53 hours on this case."  (Dkt. No.

16  56-1 at ¶ 9.)  In support, she submits time entries for specific tasks between January 8, 2018 and

17  November 4, 2019.  (*See* Dkt. No. 56-1, Ex. A.)  Mr. Benjamin attests that Class Counsel

18  expended 159.75 total hours on this case through November 4, 2019, (Dkt. No. 56-2 at ¶ 22), and

19  submits invoices for specific tasks performed through November 4, 2019, (*see* Dkt. No. 56-2, Ex.

20  A).  The invoices are sufficiently detailed and reflect hours Class Counsel reasonably expended on

21  behalf of Plaintiffs.

### c.      Lodestar Calculation

23       Class Counsel attests that its lodestar is $70,693.75, representing 159.75 hours of work on

24  this case through November 4, 2019.  (Dkt. No. 56-2 at ¶ 22.)  Mr. Benjamin attests that the

25  lodestar "does not reflect all of the time all four attorneys staffed on this matter, including

26  Attorneys Brian Hawes, Esq. and Dominique Thomas, Esq., have invested in this case because

27  counsel would need to reconstruct time for three attorneys that work primarily on contingency fee

28  matters."  (*Id.*)  Further, Mr. Benjamin attests that those "[a]ttorneys did not contemporaneously

United States District Court
Northern District of California

capture and bill all time worked on this matter, so reconstructing that time would require a substantial amount of time and resources by counsel, and require substantial time from the Court for the Court's review."  (*Id.*)

Courts retain discretion to apply a positive or negative enhancement, or "multiplier" where appropriate.  *See Ketchum*, 24 Cal. 4th at 1132 (noting that the lodestar may be adjusted based on factors including "(1) the novelty and difficulty of the questions involved, (2) the skill displayed in presenting them, (3) the extent to which the nature of the litigation precluded other employment by the attorneys, [and] (4) the contingent nature of the fee award"); *see also Bluetooth*, 654 F.3d at 942 (noting that a lodestar may be adjusted "upward or downward by an appropriate positive or negative multiplier reflecting a host of reasonableness factors, including the quality of the representation, the benefit obtained for the class, the complexity and novelty of the issues presented, and the risk of nonpayment") (internal quotation marks and citation omitted).

As to the first two factors noted in *Ketchum*, the California Supreme Court cautioned that "the difficulty of a legal question and the quality of representation are already encompassed in the lodestar."  *See Ketchum*, 24 Cal. 4th at 1138-39 ("A more difficult legal question typically requires more attorney hours, and a more skillful and experienced attorney will command a higher hourly rate.").  Here, there is no indication that the wage-and-hour issues were novel or that Class Counsel exhibited "exceptional representation" by "exceed[ing] the quality of representation that would have been provided by an attorney of comparable skill and experience billing at the hourly rate used in the lodestar calculation."  *See id.* at 1139.  However, "the extent to which the nature of the litigation precluded other employment" by Class Counsel and "the contingent nature of the fee award" warrant a positive multiplier.  *See id.* at 1132.

First, Mr. Benjamin attests that:

> This case has been litigated over a two-year period during which [he] paid at least three employee-attorneys whom were staffed on this matter at various times during its pendency.  Due to limited resources as a small law firm, my firm was unable to take other matters during this time.

(Dkt. No. 56-2 at ¶ 21.)  At the final approval hearing Mr. Benjamin clarified that this action has required the majority of his firm's resources and attention since January 2018.  Second, Class

United States District Court
Northern District of California

Counsel undertook this litigation facing a risk of nonpayment because "Plaintiffs were represented on a pure contingency basis." (*See* Dkt. No. 56-1 at ¶ 8.) Third, Mr. Benjamin attests that the hours expended for purposes of the lodestar calculation do not reflect the total time his firm spent on this litigation. In sum, a positive multiplier is warranted.

That said, awarding the fees requested here—$550,000—would result in a multiplier of 7.8. Such an enhancement is not reasonable and is instead "far outside the normal range." *See Laffitte*, 1 Cal. 5th at 504. As the *Laffitte* court explained:

> If a comparison between the percentage and lodestar calculations produces an imputed multiplier far outside the normal range, indicating that the percentage fee will reward counsel for their services at an extraordinary rate even accounting for the factors customarily used to enhance a lodestar fee, the trial court will have reason to reexamine its choice of a percentage.

*Id*. The Ninth Circuit has recognized that multipliers generally range from 1 to 4. *See Vizcaino*, 290 F.3d at 1051 n.6.

A multiplier of 4 is warranted here based on the contingent nature of the fee agreement and Mr. Benjamin's explanation at the final approval hearing that this action required the majority of his firm's resources and attention since January 2018. The high end multiplier is warranted because it would result in a percentage of recovery of 12.9% of the Gross Settlement Amount, which is below "the usual range" awarded in common fund cases. *See Vizcaino*, 290 F.3d at 1047 (noting that "20-30% [is] the usual range" in common fund cases). The Court recognizes that the lodestar most likely undercounts the attorney time incurred in this matter given that some attorneys did not contemporaneously record their time. That is a problem, however, of Class Counsel's own making. If Class Counsel wishes to receive credit for time expended representing a class, then they—as most attorneys already do—must contemporaneously record their time. It is unreasonable to expect a class to pay for time that counsel could not even bother to record. Reconstructing time long after the fact is not appropriate, especially for counsel with a fiduciary duty to the class.

Accordingly, the Court awards Class Counsel attorneys' fees in the amount $282,775.

//

### B.       Litigation Costs

"There is no doubt that an attorney who has created a common fund for the benefit of the class is entitled to reimbursement of reasonable litigation expenses from that fund." *Ontiveros*, 303 F.R.D. at 375 (citations omitted).  To that end, district courts in the Ninth Circuit regularly award litigation costs and expenses in wage-and-hour class actions.  *See, e.g., Nwabueze v. AT&T Inc.*, No. C 09-01529 SI, 2014 WL 324262, at *2 (N.D. Cal. Jan. 29, 2014); *LaGarde v. Support.com, Inc.*, No. C12-0609 JSC, 2013 WL 1283325, at *13 (N.D. Cal. Mar. 26, 2013). Here, Plaintiffs request $12,431.44 in litigation costs representing litigation expenses through November 4, 2019.  (Dkt. No. 56 at 16-17.)  Plaintiffs never submitted an updated request for costs, so this final approval order can only approve what has been submitted.  In support of their request Plaintiffs submit the declaration of Ms. Villanueva, who attests to the amount, (Dkt. No. 56-1 at ¶ 11), and submits a summary of costs, (Dkt. No. 56-1, Ex. B at 10).  The summary of costs itemizes the costs incurred, including $10,000 for private mediation; all of the costs appear reasonable.  (*See id.*)  The total amount reflected in the summary of costs is $12,428.44.  (*Id.*) That amount is also reflected in the invoice submitted as an exhibit to Mr. Benjamin's declaration. (*See* Dkt. No. 56-2, Ex. A at 11.)

Accordingly, the Court awards Plaintiffs $12,428.44 in costs.

### C.       Incentive Awards

"Incentive *awards* are fairly typical in class action cases." *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 958 (9th Cir. 2009) (distinguishing incentive awards from incentive agreements, the latter of which are "entered into as part of the initial retention of counsel" and "put class counsel and the contracting class representatives into a conflict position from day one").  However, the decision to approve such an award is a matter within the Court's discretion.  *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 463 (9th Cir. 2000).  Incentive awards "are intended to compensate class representatives for work done on behalf of the class, to make up for financial or reputation risk undertaken in bringing the action, and, sometimes to recognize their willingness to act as a private attorney general." *Rodriguez*, 563 F.3d at 958-59.  Although incentive awards are viewed more favorably than incentive agreements, excessive awards "may put the class representative in a

United States District Court
Northern District of California

conflict with the class and present a considerable danger of individuals bringing cases as class

actions principally to increase their own leverage to attain a remunerative settlement for

themselves and then trading on that leverage in the course of negotiations." *Id.* at 960 (internal

quotation marks and citation omitted).  Thus, "district courts must be vigilant in scrutinizing all

incentive awards to determine whether they destroy the adequacy of the class representatives."

*Radcliffe v. Experian Info. Sols. Inc.*, 715 F.3d 1157, 1164 (9th Cir. 2013).

In determining whether an incentive award is reasonable, courts generally consider:

> (1) the risk to the class representative in commencing a suit, both financial and otherwise; (2) the notoriety and personal difficulties encountered by the class representative; (3) the amount of time and effort spent by the class representative; (4) the duration of the litigation; and (5) the personal benefit (or lack thereof) enjoyed by the class representative as a result of the litigation.

*Covillo v. Specialtys Café*, No. C–11–00594-DMR, 2014 WL 954516, at *8 (N.D. Cal. Mar. 6,

2014) (quoting *Van Vranken v. Atl. Richfield Co.*, 901 F. Supp. 294, 299 (N.D. Cal. 1995)).  A

class representative must justify an incentive award through "evidence demonstrating the quality

of plaintiff's representative service," such as "substantial efforts taken as class representative to

justify the discrepancy between [his] award and those of the unnamed plaintiffs." *Alberto v.*

*GMRI, Inc.*, 252 F.R.D. 652, 669 (E.D. Cal. 2008).  Further, district courts must evaluate each

incentive award individually.  *See Staton*, 327 F.3d at 977.

In support of the requested incentive awards, Plaintiffs submit the declaration of Class

Counsel Mr. Benjamin, who attests that:

> Plaintiffs assisted my office with investigation of the claims by, among other things, participating in multiple telephone conferences to discuss Defendant's policies and practices and their experiences. Each named Plaintiff also supervised other employees and provided insight on potential class members, class discovery, and practices beyond their specific work locations. Each Plaintiff spent time locating and producing documents relating to their time working for Defendant and participated in an informal interview before counsel for both parties. Plaintiffs also risked being responsible for Defendant's costs if the case was lost and risk to their future employment prospects damaged by the fact that they are a named plaintiff in a class action wage and hour lawsuit against a former employer.

(Dkt. No. 56-2 at ¶ 26.)  Plaintiffs' submissions include no declarations from the named Plaintiffs

themselves attesting to their *individual* contributions to the case.  Thus, the Court is unable to assess the relevant factors on an individual basis to determine whether incentive awards are justified for each Plaintiff.  *See Staton*, 327 F.3d at 977.  However, the requested amount ($8,000) is reasonable on its face given the Gross Settlement Amount of $2,200,000 and a Net Settlement Amount of over $1,500,000.  *See Lopez v. Bank of Am., N.A.*, No. 10-cv-01207-JST, 2015 WL 5064085, at *8 (N.D. Cal. Aug. 27, 2015) (noting that incentive awards of $5,000 are presumptively reasonable in the Ninth Circuit) (citing *Harris*, 2012 WL 381202, at *7 (collecting cases)).  Further, and more importantly, the incentive awards of $2,000 each are not disproportionate to the average class member's recovery, which is over $3,000.  *See Lopez*, 2015 WL 5064085, at *8 ("When determining if an incentive payment is reasonable, courts consider the proportionality between the incentive payment and the range of class members' settlement awards.") (collecting cases).  Thus, there is no indication that incentive awards of $2,000 each will "destroy the adequacy of the class representatives" by "creat[ing] an unacceptable disconnect between the interests of [the class representatives] and class counsel, on the one hand, and members of the class on the other," because the individual incentive awards are less than the average class member's recovery.  *See Radcliffe*, 715 F.3d at 1164.

Accordingly, the Court concludes that incentive awards of $2,000 to each named Plaintiff are reasonable.

**III.    Settlement Administrator Costs**

The Settlement Agreement provides that the Settlement Administrator will be paid a maximum of $9,000 from the Gross Settlement Amount for its fees and costs.  (Dkt. No. 58-1, Ex. A at ¶ 68.)  Plaintiffs' motion for final approval requests $7,500 for "Simpluris' total fees and costs for services in connection with the administration" of the settlement.  (Dkt. No. 58 at 21.) The requested amount "includes fees and costs incurred to-date, as well as anticipated fees and costs for completion of the settlement administration."  (*Id.*)  In support, Plaintiffs submit the declaration of Mr. Salinas, who attests to the amount requested and details the tasks Simpluris completed as of February 25, 2020.  (*See* Dkt. No. 63, Ex. B at ¶¶ 3-10, 14.)

The Court concludes that the requested administrative costs are reasonable.

*United States District Court*
*Northern District of California*

1

United States District Court
Northern District of California

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CONCLUSION**

For the reasons stated above, the Court GRANTS Plaintiffs' motion for final approval of the parties' class action settlement.  In addition, the Court GRANTS IN PART Plaintiffs' motion for attorneys' fees and costs; specifically, the Court awards the following: $282,775 in attorneys' fees; $12,428.44 in litigation costs; $2,000 each as incentive awards to Plaintiffs Almendarez, Dangerfield, Naples, and Uschold; and $7,500 to the Settlement Administrator.

In accordance with the Northern District's Procedural Guidance for Class Action Settlements, "[w]ithin 21 days after the distribution of the settlement funds and payment of attorneys' fees," Class Counsel shall file "a Post-Distribution Accounting" that provides the following:

> The total settlement fund, the total number of class members, the total number of class members to whom notice was sent and not returned as undeliverable, the number and percentage of claim forms submitted, the number and percentage of opt-outs, the number and percentage of objections, the average and median recovery per claimant, the largest and smallest amounts paid to class members, the method(s) of notice and the method(s) of payment to class members, the number and value of checks not cashed, the amounts distributed to each cy pres recipient, the administrative costs, the attorneys' fees and costs, the attorneys' fees in terms of percentage of the settlement fund, and the multiplier, if any.

https://www.cand.uscourts.gov/forms/procedural-guidance-for-class-action-settlements/.  Class Counsel shall "summarize this information in an easy-to-read chart that allows for quick comparisons with other cases," and "post the Post-Distribution Accounting, including the easy-toread chart, on the settlement website."  *See id.*

**IT IS SO ORDERED.**

Dated:

_____
JACQUELINE SCOTT CORLEY
United States Magistrate Judge